William D. JOHNSON, Plaintiff–Appellant,

v.

Louis W. SULLIVAN, Secretary, Department of Health and Human Services, Defendant–Appellee.

No. 90–2374.

United States Court of Appeals, Seventh Circuit.

Argued Feb. 12, 1991.

Decided Oct. 9, 1991.

As Amended Oct. 31, 1991.

Steven F. Molo (argued), Christopher S. Canning (argued), Winston & Strawn, Chicago, Ill., for plaintiff-appellant.

Gail C. Ginsberg (argued), Ira H. Raphaelson, Charles E. Ex, Asst. U.S. Attys., Crim. Div., Nancy K. Needles, Asst. U.S. Atty., Civ. Div., Appellate Section, Chicago, Ill., for defendant-appellee.

Before CUDAHY and RIPPLE, Circuit Judges, and ESCHBACH, Senior Circuit Judge.

CUDAHY, Circuit Judge.

William Johnson sued his former employer, the Department of Health and Human Services (HHS), for race and handicap discrimination. At issue here is his claim under section 704 of Title VII, 42 U.S.C. § 2000e–3 (1988), for his firing, which he alleges was the Department's response to his Equal Employment Opportunity (EEO) complaint, union grievances and federal lawsuit. Johnson's supervisors claim that they fired him because of low scores on his performance evaluations. The district court granted summary judgment for the Secretary on the EEO retaliation claim and after a trial found for the defendant on the

federal lawsuit claim. Johnson appeals both decisions, claiming that the performance evaluations masked the Department's retaliatory intent and were the product of inadequate accommodation of his blindness.

## I.

Johnson, who is blind and African–American, worked as an Equal Opportunity Specialist at HHS's Office for Civil Rights (OCR), where he investigated discrimination complaints against HHS-funded facilities. In November 1977 he started work in the "Intake" section, which determines the validity of incoming complaints and assesses the Department's jurisdiction. Over time his duties expanded to include complaint investigation, requiring both office and field work.

Whether the Department adequately accommodated Johnson's blindness was the subject of a series of union grievances and EEO claims. Johnson filed a union grievance in February 1980 seeking readers, equipment and a quiet work area. This and a similar grievance of January 1981 were denied. In June 1981 Johnson filed an EEO complaint, again seeking workplace accommodations. Between June 1981 and February 1984 Johnson filed seven more union grievances and another EEO complaint. In November 1983, while he waited for a hearing on his EEO complaint, Johnson decided that he instead wanted to proceed directly with a federal suit. The Equal Employment Opportunity office issued a Right to Sue letter,[1] which Johnson received on February 14, 1984, and which gave him thirty days to begin his suit. He filed his complaint on February 29, and on March 1, 1984, Johnson received a letter proposing his termination effective April 3,

1984. Final notice of his termination issued on April 2.

While Johnson pursued his accommodation claims, his work quality, measured by performance evaluations, declined. Since 1981, HHS employees have been evaluated under an Employee Performance Management System.[2] Johnson's review for 1982, dated January 19, 1983, gave him "partially met" scores for two critical elements and a "minimally satisfactory" evaluation overall. Edward Cabell, one of Johnson's supervisors,[3] put Johnson on a Performance Improvement Plan. On June 27, 1983, the end of the Plan's 120 days, Johnson's performance had declined to the point that he received a zero on a critical job element. The supervisors extended Johnson's evaluation period to the end of 1983. On his February 8, 1984, evaluation, Johnson received a zero for one critical element and for two non-critical elements, a one for a non-critical element, a two for a non-critical element and two threes for non-critical elements. One critical and one non-critical element were "not ratable" because Johnson had not been assigned tasks relevant to those elements. His overall rating was unsatisfactory. Johnson's scores on the performance reviews were preceded by a number of other disciplinary actions, including memoranda from supervisors and denied promotions, as reported in the affidavits of Johnson's supervisors and summarized by the district court. Mem. and Order (Jan. 23, 1989), 1989 WL 6489.

In the fall of 1983 Johnson's supervisors met to consider removing him. Tr. at 265 (testimony of Kennedy), 319–20 (testimony of Klemme), 343–44 (testimony of Ish). As part of the process, Ish asked Carl Mitchell, HHS's Assistant Regional Attorney, to

---

1. The Secretary points out that Johnson need not have waited until he received his Right to Sue letter to proceed; he had the right to sue 180 days after filing his first EEO complaint. 42 U.S.C. § 2000e–16(c); 29 C.F.R. 1613.12(b).

2. The System involves classification of an employee's tasks as "critical" or "non-critical." Supervisors then rate the employee for each element, assigning a score of four (substantially exceeded), three (exceeded), two (fully met), one (partially met) or zero (not met). The su-

pervisor also rates the employee's overall performance with a score of satisfactory, minimally satisfactory or unsatisfactory.

3. Lucille Ish was Regional Manager and Johnson's third-line supervisor. Joe Kennedy was the Division Director and Johnson's second-line supervisor. Edward Cabell was Branch Chief and Johnson's immediate supervisor. Cheryl Klemme, who participated in the termination proceedings, worked in the Personnel Office.

evaluate the legal sufficiency of a removal action. Mitchell issued the findings of his study in a memo dated February 10, 1984, which concluded that OCR had a legally sufficient basis for discharging Johnson and that Johnson's blindness had been adequately accommodated. Ish then directed Cabell to issue the notice of proposed removal, which he and Klemme did on March 1.

Cabell, Kennedy and Ish claim not to have known, at the time of Johnson's discharge, that he had filed suit on February 29 or intended earlier to do so. Johnson claims to have informed Kennedy at a meeting on February 24 of his intent to file the suit, but Kennedy denies that they discussed the matter. A memo from Kennedy, dated February 27, 1984, mentions that at the meeting Johnson indicated that his complaint could not be settled "except through the courts," but at trial Kennedy did not remember drafting it. Tr. at 173–74. Ish also may have learned of his intent because her office received a copy of his EEO Right to Sue letter, issued February 2, although she and the other supervisors claimed not to remember seeing it.

Johnson filed his *pro se* complaint on February 29, 1984. His amended complaint,[4] filed May 21, 1984, contained four counts. Count I alleged discriminatory hiring and promotion practices resulting from Johnson's blindness and race. (The race charge was implied by the court. *See* Mem. Op. and Order at 3 n. 1 (Feb. 3, 1988).) Count II alleged inadequate accommodation under the Rehabilitation Act, 29 U.S.C. §§ 791, 794a(a)(1), resulting in promotion denials and eventual discharge. (The court corrected the complaint's claim that this count arose under Title VII.) Count III alleged intentional and malicious tampering with Johnson's work product. And Count IV alleged that Johnson was fired in retaliation for his claims filed with the union, the EEOC and the court.

A series of district court rulings winnowed the suit. On June 28, 1985, the court struck Johnson's request for compensatory and punitive damages under Title VII. The court dismissed the discriminatory hiring (Count I) and alteration of work product (Count III) charges on February 3, 1988. On January 23, 1989, the court granted summary judgment for the Secretary on the promotion and discharge claims (Counts I and II), finding that Johnson was fired because of his poor work product and not because his handicap was accommodated inadequately or on account of his race.

That left only the retaliatory discharge claim (Count IV). The district court's January 23, 1989 order granted summary judgment on Johnson's claim that he was fired for filing the 1980 union grievance and 1981 EEO complaint. And after a bench trial Johnson lost the federal lawsuit retaliation claim. The court stated:

> [T]he termination of Mr. Johnson for failure to perform his work was proper and based on substantial evidence and careful review by the agency.
>
> . . . .
>
> [T]he Court also finds that Mr. Johnson's planned lawsuit played no role in the agency's decision to terminate him. All of the HHS witnesses denied the lawsuit was the cause of Mr. Johnson's termination, and the court after carefully considering the witnesses under all the applicable tests finds that the testimony of the HHS witnesses Cabell, Kennedy, Ish and their attorney, are creditable.

Tr. (Apr. 23, 1990) at 4. Johnson has appealed only the retaliation claims for the EEO complaint and federal lawsuit.

## II.

We review the factual conclusions of the judge after trial using the clearly erroneous standard, Fed.R.Civ.P. 52(a), and the legal issues surrounding Title VII we review *de novo*. The summary judgment on the EEO complaint receives *de novo* review, with all disputed factual issues and justifiable inferences therefrom resolved in

---

**4.** Johnson initially filed a *pro se* complaint, compiled with the assistance of a lawyer. He thereafter retained counsel, who filed an unsuccessful motion for preliminary injunction to enjoin plaintiff's termination. Retained counsel also filed the amended complaint but withdrew his representation in April 1986. The court appointed new counsel in April 1987.

Johnson's favor. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 255, 106 S.Ct. 2505, 2513, 91 L.Ed.2d 202 (1986); *Moodie v. School Book Fairs, Inc.,* 889 F.2d 739, 743 (7th Cir.1989).

## A. Retaliation for Filing Federal Lawsuit

■ 42 U.S.C. § 2000e–2 (1988) prohibits unlawful employment discrimination practices, and companion section 2000e–3(a) makes it unlawful for an employer to discriminate against an employee "because he has opposed any practice made an unlawful employment practice ... or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing" in connection with an unlawful employment practice. *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973), and *Texas Dep't of Community Affairs v. Burdine,* 450 U.S. 248, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981), established a three-step framework for Title VII claims. An employee must first establish a prima facie case of discrimination. The defendant then has the burden of producing a legitimate nondiscriminatory reason for the challenged action. Finally, the burden shifts back to the plaintiff to show that the proffered reasons are pretextual.[5] *See Holland v. Jefferson Nat'l Life Ins. Co.,* 883 F.2d 1307, 1313 (7th Cir.1989).[6] In retaliation claims, the prima facie case required under the first step requires: (i) a showing that the employee engaged in statutorily protected expression; (ii) an adverse action by the employer; and (iii) a causal link between the protected expression and the adverse action. *Holland,* 883 F.2d at 1313; *Collins v. Illinois,* 830 F.2d 692, 702 (7th Cir.1987).

■ Under the framework of *McDonnell Douglas,* Johnson presents a prima facie case. He engaged in protected activity by pursuing his lawsuit against the agency. His discharge was an adverse action. And the fact that the discharge took place so close in time to the protected activities supports an inference that the two are causally connected. *See Collins,* 830 F.2d at 705 (rapid succession of retaliatory events supports causal inference).

■ The burden of production then shifts back to the Secretary, who claims that Johnson's poor work motivated the firing. This meets the Department's burden. Johnson could discredit this motive by showing that the evaluations themselves are biased,[7] but he has not shown that the

---

5. A showing of pretext can be made in two ways. "The plaintiff may [show pretext] by persuading the court either directly that a racially discriminatory reason more than likely motivated the defendant or indirectly that the proffered reason for the discharge is not worthy of belief." *Caban–Wheeler v. Elsea,* 904 F.2d 1549, 1554 (11th Cir.1990) (citing *Burdine*). Other courts have articulated the first alternative in terms of mixed-motive analysis, which is perhaps only a semantic distinction. *Sischo–Nownejad v. Merced Comm. College Dist.,* 934 F.2d 1104, 1109–10 (9th Cir.1991); *Sabree v. United Bhd. of Carpenters and Joiners Local No. 33,* 921 F.2d 396, 403–04 (1st Cir.1990).

6. In *Price Waterhouse v. Hopkins,* 490 U.S. 228, 109 S.Ct. 1775, 104 L.Ed.2d 268 (1989), the Supreme Court departed slightly from this framework. The plurality, with Justice O'Connor concurring, appears to have held that when direct evidence indicates an impermissible factor played a role in the employer's decision to discharge, the defendant avoids liability only by showing with a preponderance of the evidence that it would have made the same decision without taking the impermissible factor into account. Justice O'Connor, concurring, provided:

[T]o justify shifting the burden on the issue of causation to the defendant, a disparate treatment plaintiff must show by direct evidence that an illegitimate criterion was a substantial factor in the decision.... Where a disparate treatment plaintiff has made such a showing, the burden then rests with the employer to convince the trier of fact that it is more likely than not that the decision would have been the same absent consideration of the illegitimate factor.... If the employer fails to carry this burden, the factfinder is justified in concluding that the decision was made "because of" consideration of the illegitimate factor....

490 U.S. at 276–77, 109 S.Ct. at 1804–05. Johnson has presented no direct evidence justifying application of the *Price Waterhouse* burden shift, and our analysis therefore adheres to the traditional framework.

7. The author of this opinion has indicated that he is "far from believing ... that when a defendant has alleged a factor within his control as an explanation for apparent discrimination, it is always the plaintiff's burden to show that the factor is itself biased." *Coates v. Johnson &*

Department administered the evaluations in a way that discriminated against him because of his race, handicap or intent to file complaints.

■ Johnson does claim that even if the reviews motivated his discharge, the poor evaluations resulted from the Department's failure to accommodate his handicap. The issue of what devices Johnson needed and received throughout his tenure has been disputed since Johnson's first EEO complaint. The district court has ruled against Johnson's claim twice. First, the court dismissed on summary judgment Johnson's reasonable accommodation claim under section 504 of the Rehabilitation Act, 29 U.S.C. § 794 (1988). Mem. Op. and Order (Jan. 23, 1989) (Record Item 101, at 8–15). The court concluded:

> The record ... is replete with evidence of poor performance which can have nothing to do with the adequacy of accommodation—evidence that Plaintiff consistently produced work of unacceptable quality and failed to follow both established quality control procedures and the directives of his supervisors. The record is devoid of evidence tending to show that the quality, as opposed to the quantity, of Plaintiff's work, was due to a failure of accommodation, and thus lacks any reasonable basis for inferring that the promotion denials and discharge were due solely to Plaintiff's handicap.

*Id.* at 14. Second, during the bench trial on the merits of his federal claim, Johnson introduced continued testimony about accommodation, over the defendant's objections. Tr. at 49–51. At the end of the trial, the judge, after concluding that Johnson was terminated for his poor work, added, "We know [Johnson] felt he did not get

sufficient accommodation for his blindness, and he certainly didn't get everything he asked for, but I already had dismissed that charge." Tr. at 422 (May 4, 1990). The judge could have more clearly stated whether this was a new finding of fact or merely a reiteration of his prior holding. But since he heard throughout the trial Johnson's accommodation claims, the conclusion is owed deference, and Johnson has not pointed us to compelling evidence connecting his performance to inadequate accommodation.[8] So even though the HHS knew as early as February 27, 1984, that Johnson intended to file a lawsuit, Johnson "was fired because his superiors concluded that he was not adequately performing his work." *Id.* The court's determination of motive is a finding of fact, to which we owe deference.

■ The burden to show pretext then falls to Johnson. To show that the poor performance reviews mask the Department's retaliatory intent, Johnson claims that his superiors knew about the suit before he filed it, which presumably gave them a chance to assemble a pretext. However, we have held that mere knowledge by the defendant of a pending suit does not provide, as a matter of law, that the suit is a motive. *Cf. Griffin v. Board of Regents*, 795 F.2d 1281, 1295 (7th Cir. 1986) (knowledge does not establish causation). Moreover, despite Johnson's meeting with Kennedy and Ish's receipt of the Right to Sue letter, Johnson did not convince the district court that the Department knew about his suit more than a few days before he actually filed it, while the Department has shown that the supervisors began considering Johnson's discharge as early as the previous fall. In sum, even if we attribute knowledge to the Department,

---

*Johnson,* 756 F.2d 524, 555 (7th Cir.1985) (Cudahy, J., concurring). He continues to adhere to that view, but there is no evidence or argument here concerning bias in the evaluation procedure. Moreover, the district court found that Johnson's performance reviews were not due to inadequate accommodation, a conclusion he has, as discussed *infra,* given us no reason to overturn.

8. Johnson has consistently insisted that his supervisors were indifferent to his needs and failed to provide the office machines, amenities and readers needed to accommodate his blindness. It appears particularly probative that an outside organization—the Lighthouse for the Blind—assessed Johnson's job situation and concluded that adequate accommodations had been made. Tr. at 254–55 (testimony of Kennedy).

Johnson has failed to establish that this knowledge motivated his discharge or caused the poor performance reviews.[9]

### B. *Retaliation for EEO Complaint*

■ The district court granted summary judgment on Johnson's claim that his union grievances and EEO claim motivated his discharge because nearly three years had passed between the protected activity and Johnson's firing. Mem. Op. and Order at 19 (Jan. 23, 1989). We agree that Johnson failed to show a material dispute from which a jury could find a causal nexus between these events and his discharge. Johnson filed his EEO complaint in June 1981 and the grievances from 1980 to 1984. His unsatisfactory performance review was dated January 12, 1984. He filed his *pro se* federal complaint on February 29, 1984. On March 1, 1984, Johnson learned that his employment would be terminated. If the filing of the EEO complaint or grievances triggered the discharge, Johnson offers no reasons for the supervisors' extended delay in taking action. *Cf. Hamann v. Gates Chevrolet, Inc.*, 910 F.2d 1417, 1420 (7th Cir.1990) (passage of extended time before adverse action fails to support inference of causation). Although he filed several union grievances, Johnson has not shown a causal connection between these and his discharge.

Johnson's brief also argues that the *withdrawal* of his EEO complaint in November 1983 and his decision to proceed in federal court precipitated his removal. The argument is framed thus: "[T]he Department obviously did not and would not terminate Johnson for fear of a retaliatory termination discharge claim. Now, in November, 1983, when a window of opportunity developed between the time in which Johnson withdrew his request for a hearing and the time in which he was to receive his Right to Sue letter so that he could file a federal court action, the Office for Civil Rights took steps to terminate Johnson." Appellant's Br. at 25. The district court's

order did not discuss this spin on the argument, suggesting that it may be new here. Moreover, even if we assume that the "window of opportunity" could have enticed the supervisors, the argument provides no additional nexus between protected activity (filing or withdrawing the complaint) and the adverse action. The Secretary simply did not become insulated from liability by waiting for Johnson's withdrawal of the complaint. Finally, even though Johnson asserts that the time between his EEO complaint and his firing gave the Department time to assemble a pretext, he has not rebutted the Secretary's claim that poor performance reviews were the motivating consideration.

AFFIRMED.

---

**9.** Johnson might have conceded dual motivations but nonetheless attempted to show that it was unlikely he would have been fired without the illegal motivation. *Caban–Wheeler*, 904

F.2d at 1554. However, this would probably have been in vain, as the district court specifically found that Johnson's termination was the result of his poor reviews.