**Diane LARSEN, Plaintiff,**

v.

**CLUB CORPORATION OF AMERICA, INC., Defendant.**

**No. 93 C 3244.**

United States District Court,
N.D. Illinois,
Eastern Division.

June 1, 1994.

Ernest T. Rossiello, Chicago, IL, for plaintiff.

Don E. Glickman, Chicago, IL, for defendant.

### MEMORANDUM OPINION AND ORDER

SHADUR, Senior District Judge.

Diane Larsen ("Larsen") has sued Club Corporation of America, Inc. ("CCA") and various of its subsidiaries [1] (defendants are collectively referred to as "Clubs"), charging that they violated a provision of the Fair Labor Standards Act ("FLSA") (29 U.S.C. § 215(a)(3)) [2] by refusing to allow her to fill jobs at two clubs and by including false statements in her personnel file in retaliation for her asserting a right to overtime wages.[3]

---

1. Other defendants named in Larsen's Third Amended Complaint ("Complaint") are The Meadow Club, Inc. ("Meadow"), Lakeshore Center Management Co., Inc. ("Lakeshore Management") and Exchange Club Management Co. ("Exchange"). Although Larsen's lawyer does not have Lakeshore Management's or Exchange's corporate names quite right in the Complaint, they are close enough to the actual names to avoid any confusion.

2. Further citations to FLSA will take the form "Section—," referring to the section designations in Title 29 rather than to FLSA's internal numbering.

3. Larsen sues under Section 216(b), which creates a private right of action to redress violations of Section 215(a)(3) (*Crowley v. Pace Suburban Bus Div.*, 938 F.2d 797, 798 n. 2 (7th Cir.1991)).

Clubs have moved for summary judgment under Fed.R.Civ.P. ("Rule") 56.[4] For the reasons set forth in this memorandum opinion and order, Clubs' motion is granted.

### Facts [5]

Larsen first started working for CCA-affiliated clubs in 1978, ultimately working for a total of five such clubs by transferring from one to another (D. 12(m) ¶ 17; Larsen Dep. II 72 [6]; Larsen Dep. II Ex. 2). On March 23, 1989 she resigned her job as a pastry chef at the Metropolitan Club of Chicago, Inc. ("Metropolitan"), a wholly-owned subsidiary of CCA, to become the Food and Beverage Manager at the Lakeshore Athletic Club ("Lakeshore"), which is managed by Lakeshore Management (D. 12(m) ¶¶ 2, 3).

Shortly after that transfer (on April 7, 1989) Larsen consented to become a plaintiff in *Avitia v. Metropolitan Club of Chicago*, No. 88 C 6965 (N.D.Ill.), a pending lawsuit that charged Metropolitan with violations of FLSA for failure to pay overtime wages (D. 12(m) ¶ 4; P. 12(n)(2) ¶ 18).[7] While at Lakeshore Larsen was neither harassed nor discriminated against because of her partic-ipation in that suit (D. 12(m) ¶ 5). Ultimately on April 2, 1993 she was awarded $12,621 in damages for that claim (P. 12(n)(2) ¶ 19; P.Ex. 21).

■ Meanwhile, in May 1990 Larsen had telephoned head chef James Draveneck ("Draveneck") at the CME Club ("CME"), a private club managed by Exchange, to inquire about the possibility of a job (D. 12(m) ¶ 7).[8] On May 28 the two of them met with CME manager Donna Kozak ("Kozak") to discuss that possibility (P. 12(n)(2) ¶ 8; Larsen Dep. I 18). According to Larsen, she was told that a position would be available shortly because an employee was going to take maternity leave (D. 12(m) ¶ 18; Larsen Dep. I 19). Assertedly Kozak said the position would pay $10 an hour, but then agreed to the $12 an hour that Larsen "thought [she] was worth" (Larsen Dep. I 19). After the meeting Larsen says she spoke alone with Draveneck in his office, and he told her that she was to start the first Monday after July 4 and her hours were to be 5 a.m. to 1 p.m. Monday through Friday (Larsen Dep. I 19–20; P. 12(n)(2) ¶ 8).[9]

---

4. Familiar Rule 56 principles impose on the movant the burden of establishing the lack of a genuine issue of material fact (*Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23, 106 S.Ct. 2548, 2552–53, 91 L.Ed.2d 265 (1986)). For that purpose this Court is "not required to draw every conceivable inference from the record—only those inferences that are reasonable"—in the light most favorable to nonmovant Larsen (*Bank Leumi Le–Israel, B.M. v. Lee*, 928 F.2d 232, 236 (7th Cir.1991) and cases cited there).

5. This District Court has instituted its own General Rule ("GR") 12 to facilitate the resolution of Rule 56 motions:

 1. GR 12(m) requires every Rule 56 movant to submit a statement of assertedly uncontested facts, with citations to the record in support of each of those facts.

 2. GR 12(n) requires the nonmovant to respond point by point, with citations to the record in support of (a) any claimed contest of the movant's version of the facts and (b) any additional facts that the nonmovant chooses to assert.

Both parties filed such submissions. Clubs' GR 12(m) statement will be cited "D. 12(m) ¶ —," while Larsen's GR 12(n) response will be cited "P. 12(n)(1) ¶ —" and her statement of additional facts will be cited "P. 12(n)(2) ¶ —." Where Larsen admits any part of D. 12(m), only the latter will be cited.

6. Larsen's depositions taken September 23, 1992 and September 8, 1993 will be cited respectively as her Dep. I and Dep. II.

7. While neither party refers to any part of the record that explicitly states that *Avitia* alleged FLSA violations—as opposed to a violation of state law or breach of an employment contract—Clubs in effect concede the issue in their memoranda.

8. Although the parties contest the title of the exact position for which Larsen applied, that issue is irrelevant here.

9. While Kozak and Draveneck dispute Larsen's version by claiming that she was *not* offered a job at CME on May 28, 1990 (Kozak Aff. ¶ 3; Draveneck Dep. 18–20, 35–36), that does not relate to a material (that is, outcome-determinative) fact. Section 215(a)(3) prohibits employers from taking adverse actions *only* when they do so because an employee has brought a claim under FLSA. It does not prohibit an employer for making employment decisions for any other reason, even capricious reasons, of course excluding membership in "some other protected category" (*Kier v. Commercial Union Ins. Cos.*, 808 F.2d 1254, 1259 (7th Cir.1987)). Hence the fact that CME assertedly both hired and then fired Larsen before her scheduled starting date is irrelevant

Larsen then told Lakeshore's manager Walter Reule ("Reule") of her intent to transfer to CME, to which he responded "that was fine" (Larsen Dep. I 20; Reule Dep. 13–14). At some point thereafter Larsen resigned her position at Lakeshore (D. 12(m) ¶ 9). Jeff Robinson ("Robinson") was then transferred from Meadow to Lakeshore to fill her position (Reule Dep. 19; P. 12(n)(2) ¶ 29).

About a week before Larsen thought that she was to begin working at CME she called Draveneck, who told her that "I can't hire you. . . . Donna [Kozak] said [I] couldn't hire [you]" (D. 12(m) ¶ 9; Larsen Dep. I 22). Larsen promptly called Meadow's chef Greg Carso ("Carso") to apply for the sous chef position that Robinson had vacated to fill the position that Larsen had left at Lakeshore (D. 12(m) ¶ 22). According to Larsen, Carso told her that he needed "some help" but would first have to discuss the matter with Meadow's manager Steve Strumpf ("Strumpf") (P. 12(n)(2) ¶ 30; Larsen Dep. I 25). When Larsen again called on July 4, Carso said he could not hire her but didn't say why (P. 12(n)(2) ¶¶ 32, 33; Larsen Dep. I 26–27). Larsen then called Meadow's restaurant manager Mark Condie ("Condie"), who said that he would look into the matter (P. 12(n)(2) ¶ 34) and who later met with Carso. According to Condie, Carso said that Larsen would not be hired "because she has a lawsuit going against CCA or Metropolitan Club" (P. 12(n)(2) ¶ 35; Condie Dep. II 11).[10]

■ Larsen also attempts to create the inference that CCA regional manager Richard Barbrow ("Barbrow"), who supervised CME and Meadow in addition to other clubs (P. 12(n)(1) ¶ 25), ordered that she not be hired in retaliation for pursuing a FLSA claim. Larsen argues that such an inference is reasonable based on Barbrow's knowledge of her involvement in *Avitia* and his supervisory role over CME and Meadow. That contention must be and is rejected. Although Barbrow knew at some unspecified time that Larsen was a plaintiff in *Avitia* (Barbrow Dep. 21–22), he swore that he was not aware that she had applied for positions at CME and Meadow and that he never directed any club not to hire her (Barbrow Aff. ¶¶ 3–4).[11] Larsen has offered nothing substantive to contradict or even to discredit that.[12]

As to Larsen's application for a position at CME, both Kozak and Draveneck state that after their meeting with Larsen the two of them discussed the matter later that same day. At that time Kozak decided not to fill the position Larsen was applying for in order to cut costs, so she told Draveneck not to hire Larsen (D. 12(m) ¶ 18; Kozak Aff. ¶ 3; Draveneck Dep. 35–36). At the time that

here. On her version of the events she might have a state law claim for breach of contract (as to which she might have invoked this Court's supplemental jurisdiction under 28 U.S.C. § 1367(a)), but the case has not been framed in that way.

10. In contrast to that, Carso testified that he told Larsen that the sous chef position was not being filled at that time and denied that he ever told Condie that Larsen could not be hired because of her participation in *Avitia* (D. 12(m) ¶ 27). That raises a credibility issue inappropriate for resolution on a motion for summary judgment (*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986))—instead this Court must credit Condie's version. More on this subject later.

11. Of course Barbrow's mere knowledge of Larsen's involvement in *Avitia* is insufficient to establish that the suit was the motive for treatment that she received from the CCA-affiliated clubs

(*Johnson v. Sullivan*, 945 F.2d 976, 981 (7th Cir.1991)).

12. Larsen's attempt to undercut Barbrow's assertion by admitting the contents of his affidavit, but denying what Barbrow said "as to his credibility and the other facts and circumstances in the record considered as a whole" (P. 12(n)(1) ¶ 31), is completely without merit. Larsen seeks to rely on her own deposition testimony in which she makes the unsupported allegations that Barbrow knew that she was leaving Lakeshore and said she was not to be hired. She also refers to Barbrow's own deposition, where he states that he shared offices with Metropolitan during the period that it was subject to overtime wage audits that resulted in *Aviatia*. But those references support no reasonable adverse inference of the type claimed by Larsen. Because those parts of the record are insufficient to call into question either Barbrow's credibility in general or the specifics of his testimony in the respects covered by his affidavit, his statements must be credited for purposes of Clubs' Rule 56 motion.

decision was made, neither was aware that Larsen had a suit pending against Metropolitan (Kozak Aff. ¶ 5; Draveneck Dep. 29–30). Moreover, Larsen admits that she knows of no one other than those two who was involved in the decision not to hire her at CME (D. 12(m) ¶¶ 15, ¶ 18).

As for Larsen's effort's to get a job at Meadow, Strumpf attested that he met with Carso and "decided not to incur the payroll expense of an additional employee," so that no one was hired for the position (Strumpf Aff. ¶ 5). Strumpf swore that during that meeting he did not know that Larsen had applied for Robinson's old position, and in fact her name was not mentioned at all (*id.* ¶ 7). Similarly, Carso testified that Larsen's involvement in *Avitia* was not a factor considered in the decision not to hire her, but rather that the decision was made in light of the fact that Meadow's actual revenues were roughly $125,000 below budget (D. 12(m) ¶¶ 27, 28).

To this day (or more precisely, as of the time that the filings were made in connection with Clubs' current motion) neither of the positions for which Larsen applied has even been filled—part of defendants' continuing efforts to cut costs (D. 12(m) ¶¶ 18, 29; Kozak Aff. ¶ 3; Strumpf Aff. ¶ 6). Exchange has continued to operate without the kitchen job that had been held by the employee who left for maternity leave (D. 12(m) ¶ 18), while Meadow has permanently reduced its staff from two sous chefs to one (*id.* ¶ 29). That means that between 3 and 3-½ years have elapsed with *no one* holding either of the jobs that Larsen claims were denied to her as a retaliatory measure.

On May 21, 1991, roughly a year after Larsen left Lakeshore, either Robinson or

Lakeshore's Controller Michael Dow filled out an "EMPLOYEE SEPARATION FORM."[13] That form listed Larsen's last day as April 1, 1990 and, under the section headed "QUIT," listed as the reasons for her leaving two items: "Dissatisfied—career opportunities" and "Walked off job" (Complaint Ex. A; P. 12(n)(2) ¶ 23).

*Applicable Legal Standards*

Section 215(a)(3) states, in relevant part:

> [I]t shall be unlawful for any person—
>
> (3) to discharge or in any other manner to discriminate against any employee because such employee has filed any complaint or instituted or caused to be instituted any proceeding under or related to this chapter . . . .

As in other employment discrimination cases, a plaintiff alleging retaliatory discharge under Section 215(a)(3) may proceed either by way of the "mixed-motives" analysis announced in *Price Waterhouse v. Hopkins,* 490 U.S. 228, 109 S.Ct. 1775, 104 L.Ed.2d 268 (1989) or via the approach earlier established in *McDonnell Douglas v. Green,* 411 U.S. 792, 802–04, 93 S.Ct. 1817, 1824–25, 36 L.Ed.2d 668 (1973) and reconfirmed in *Texas Dep't of Community Affairs v. Burdine,* 450 U.S. 248, 252–53, 101 S.Ct. 1089, 1093–94, 67 L.Ed.2d 207 (1981).[14] *Price Waterhouse* applies where *both* discriminatory and nondiscriminatory considerations influenced an employer in making an adverse employment decision, while the *McDonnell Douglas–Burdine* sequence is used where "*either* a legitimate *or* an illegitimate set of considerations led to the challenged decision" (*Price Waterhouse,* 490 U.S. at 247, 109 S.Ct. at 1789).[15]

---

**13.** Just which of them did that is unclear (P. 12(n)(2) ¶ 23), but it makes no difference here.

**14.** While *Price Waterhouse* and *McDonnell Douglas–Burdine* dealt with charges of race discrimination in violation of Title VII, their methods of analysis have never been limited to that context. This Court, for example, has applied the *McDonnell Douglas–Burdine* approach to claims brought under Section 215(a)(3) in *Cuevas v. Monroe Street City Club, Inc.,* 752 F.Supp. 1405, 1410 (N.D.Ill.1990). Although *Price Waterhouse* has yet to be applied in a retaliatory treatment case in this circuit, our Court of Appeals has

suggested that it would do so in a suitable case (see, e.g., *Johnson,* 945 F.2d at 980 n. 6; see also *Griffiths v. CIGNA Corp.,* 988 F.2d 457, 468–72 (3d Cir.1993), applying *Price Waterhouse* in a retaliatory discharge case).

**15.** In the summary judgment context, of course, Larsen's burden is only that of creating reasonable inferences, not one of proof as such (see *Anderson v. Baxter Healthcare Corp.,* 13 F.3d 1120, 1124 (7th Cir.1994)). But any continued repetition of that burden involves an awkward locution, an awkwardness contributed to by the fact that so much of the case law speaks of what

■ Because any shifting of the burden of persuasion is really irrelevant to a Rule 56 motion, all that need be said about *Price Waterhouse* is that the plaintiff's responsibility is to create a reasonable inference that retaliatory considerations were a *"substantial* factor" in the complained-of adverse employment decision (*id.* at 259, 265, 109 S.Ct. at 1795, 1798 (concurring opinions of White and O'Connor, JJ.) (emphasis in original)). And because the three-stage analysis under *McDonnell Douglas–Burdine* is so familiar, this opinion will not rehearse it at this point except to recapitulate Larsen's burden at the first step of that analysis, the prima facie case. On that score Larsen must show that (*Rennie v. Dalton,* 3 F.3d 1100, 1109 (7th Cir.1993), quoting *Holland v. Jefferson Nat'l Life Ins. Co.,* 883 F.2d 1307, 1313 (7th Cir. 1989)):

> (1) she engaged in statutorily protected expression;
>
> (2) she suffered an adverse action by her employer; and
>
> (3) there is a causal link between the protected expression and the adverse action.[16]

### Application of the Standards

Because Section 215(a)(3) embraces any "manner" of discrimination against an employee in retaliation for asserting an FLSA claim, the fact that Larsen had already quit her Lakeshore position when she was turned down for employment at CME and Meadow is irrelevant. Larsen asserts, and Clubs do not really contest, that Clubs regularly allow employees to move among the CCA-owned and -operated clubs when positions become available.[17] With that nonissue out of the way, this opinion now turns to the merits of Larsen's claim.

### 1. CME Job Application

■ Here there is no "mixed-motives" potential, so there is no need to speak in *Price Waterhouse* terms at all. Instead *McDonnell Douglas–Burdine* provides the relevant legal framework.

Clearly Larsen satisfies the first two elements of the prima facie test. Her joinder in the *Avitia* suit for overtime wages due under FLSA was an exercise of statutorily protected expression, and her not being hired for the position at CME was obviously an adverse employment action. But it is equally clear that she cannot provide the third element, that of a "causal link" between her suit and her failure to be hired at CME.

■ In employment discrimination cases it is only "the perception of the decision maker which is relevant" in determining the motivation for an adverse employment action (*Karazanos v. Navistar Int'l Transp. Corp.,* 948 F.2d 332, 337–38 (7th Cir.1991)). Here the only relevant decisionmakers (Kozak and Draveneck) were unaware of Larsen's statutorily protected expression—her involvement in *Avitia.* Absent such awareness there cannot be any "causal link" between that involvement and the ultimate decision not to hire Larsen—by definition an event of which a person is unaware cannot be a factor in any decision reached by that person (*O'Connor v. CTA,* 985 F.2d 1362, 1369–70 (7th Cir.1993)).

an employee must "prove" or "show." Accordingly, whenever this opinion employs such terms it should be understood as meaning Larsen's lesser burden of creating reasonable inferences, not her actually bearing the burden of persuasion. That inference-creating burden is the test that this Court has in fact used throughout this opinion.

**16.** [Footnote by this Court] Clubs suggest (citing *Wrenn v. Gould,* 808 F.2d 493, 500 (6th Cir.1987) and *Cohen v. Fred Meyer, Inc.,* 686 F.2d 793, 796 (9th Cir.1982)) that a fourth element of the prima facie case should be that they knew Larsen had engaged in statutorily protected activity. Of course where there is no reasonable inference of such knowledge on the employer's part, the em-

ployee must lose on a claim that some adverse employment action was retaliatory in nature. But in any event a showing of such knowledge has implicitly been required by our Court of Appeals as part of the third element that there be a "causal link between the protected expression and the adverse action" (see, e.g., *Roger v. Yellow Freight Sys.,* 21 F.3d 146, 149–150, (7th Cir. 1994))—and indeed *Cohen* also analyzed the issues exactly that way.

**17.** That practice is confirmed by the facts that Larsen transferred four times between CCA clubs before leaving Lakeshore, that she was considered for positions at CME and Meadow and that Robinson transferred to Lakeshore from Meadow.

■ As indicated earlier, Larsen Mem. 14 contends that the record supports the inference that it was Barbrow who ordered that she not be hired. But it is clearly not sufficient simply to show (as the record discloses) that Barbrow knew of Larsen's suit and had a supervisory role over CME as a regional manager of CCA. If that were enough, an inference of retaliatory or discriminatory behavior would be called for every time any senior manager knew that (1) a present or prospective employee was a member of a protected class or engaged in protected activity and (2) the employee suffered the consequences of an adverse employment decision.

But the law unambiguously requires more: a showing that Barbrow was active in the decision not to hire Larsen at CME. There is no room for such an inference in this case. As already stated, Barbrow flatly denies that he had any role in the decision (a denial buttressed by the sworn statements of Kozak and Draveneck), and nothing in the evidence to which Larsen points supports a contrary inference.

Larsen also attempts to rely on *Holland*, 883 F.2d at 1315 for the proposition that a "'telling' temporal sequence demonstrates [the necessary] causal link." But in that case the gap between the protected activity and the adverse action was only a week (*id.* at 1309–10), while here it was more than a year. In the earlier *Cuevas* litigation in which the same legal knights that tilt in this case (see 752 F.Supp. at 1407) respectively entered the lists on behalf of another plaintiff and another CCA subsidiary, this Court held that even where the *decisionmaker* knew of the protected activity a gap of five months was "too long for any reasonable inference of a causal link" (*id.* at 1411 & n. 11, relying on a comparable decision by our Court of Appeals,

*Benson v. Cady*, 761 F.2d 335, 342 (7th Cir. 1985)). That conclusion follows a fortiori where, as here, the elapsed time is so much greater.[18]

There is thus no genuine issue of material fact as to Larsen's failure to be hired at CME. Summary judgment in Clubs' favor is appropriate in that respect.

### 2. *Meadow Job Application*

Neither party has referred to *Price Waterhouse* at all. But given the already-discussed inference that this Court must make in Larsen's favor as between the testimony of Condie and of Carso, that case plainly provides the initial route to travel in addressing Larsen's Meadow non-hiring claim.

■ Condie's testimony that Carso said Larsen would not be hired "because she has a lawsuit going against CCA or Metropolitan Club" is classical "smoking-gun" evidence. It surely supports the reasonable inference that Larsen's participation in *Avitia* was a "substantial factor" in the decision not to hire her—if, that is, Carso was either a decisionmaker (*Oxman v. WLS–TV*, 12 F.3d 652, 659–60 (7th Cir.1993); *McCarthy v. Kemper Life Ins. Cos.*, 924 F.2d 683, 687 (7th Cir. 1991)) or provided input on which the actual decisionmaker relied (*Jardien v. Winston Network, Inc.*, 888 F.2d 1151, 1155 (7th Cir. 1989); *Crader v. Concordia College*, 724 F.Supp. 558, 564 (N.D.Ill.1989)). In this instance Strumpf made the ultimate decision not to hire Larsen at a meeting with Carso. It is surely reasonable to infer (although other inferences are also possible) either (1) that Carso's purported statement reported a view that Strumpf expressed at that meeting or (2) that Carso's statement reflected his own mindset, expressed to Strumpf, that contributed to the latter's decision.[19] In either

---

**18.** Larsen is not aided by her citation to *Townsend v. Indiana Univ.*, 995 F.2d 691, 693 (7th Cir.1993), where a three-year interval between sexual assaults and plaintiff's taking of a medical leave due to acute psychological distress (which had first manifested itself within a year after the sexual assaults) was held not to be too long "to support an inference that the events are causally related." That issue—the permissible inference of a proximate-cause relationship between prohibited conduct and a type of intangible harm

that by its very nature may often take substantial time to develop—differs dramatically from what is at issue here.

**19.** Clubs Mem. 16 says that Carso's alleged statement is hearsay, but that contention fails in light of Fed.R.Evid. 801(d)(2)(D). Clubs also cite *Brownell v. Figel*, 950 F.2d 1285, 1289 (7th Cir. 1991) and this Court's opinion in *Respect Inc. v. Committee on the Status of Women*, 781 F.Supp. 1358, 1367 (N.D.Ill.1992) (the latter opinion rely-

event Larsen has satisfied her *Price Water-house* burden in the context of this Rule 56 motion.

 That being so, the burden shifts to Clubs to show as a matter of law "that it would have made the same decision" as to Larsen even if it had not taken her *Avitia* participation into account (*Price Waterhouse*, 490 U.S. at 258, 109 S.Ct. at 1795). In that respect both Strumpf and Carso testified that cost-cutting was the reason for not hiring anyone at Meadow, and it is undisputed that the club's actual revenues were some $125,000 below budget. If credited, such financial considerations plainly constitute a permissible justification for the non-hiring decision (*Roger*, 21 F.3d at 151), sufficient to meet Clubs' burden of persuasion under *Price Waterhouse* as a matter of law.[20]

Is there anything that calls for a different inference—for the discrediting of that testimony? It will be recalled that Strumpf, who made the decision not to fill the position, has denied even knowing that Larsen was a job applicant at Meadow (or, for that matter, that she was a plaintiff in *Avitia*). If those denials were to be held against Meadow, it would create the anomaly that employers who admit their partial reliance on impermissible factors in reaching an adverse employment decision would actually be in a better position than those who disclaim such reliance. After all, an employer in the former category can offer evidence that before or concurrently with its consideration of impermissible factors, it also relied on permissible

factors that alone justify the decision ultimately reached. In this situation the factor that presumptively places Meadow in that category is the Rule 56 requirement that credits Condie's version of Carso's contradictory statement rather than Carso's. But how can an employer who puts forth Carso's contradictory statement—one that denies reliance on any impermissible factor to begin with—demonstrate that another (and wholly permissible) reason would "at the same time" have led to the same decision? Any such requirement would render the *Price Waterhouse* legal calculus totally unavailable to such an employer.

 Here Clubs escape that potential dilemma for an obvious reason: Meadow's second sous chef position for which Larsen applied has remained unfilled for nearly 3-½ years after Larsen's application—a permanent reduction in staffing.[21] As *Bank Leumi* (n. 4) teaches, Rule 56 does not command this Court to take leave of its common sense—Larsen is not entitled to the benefit of impossibly strained inferences, just reasonable ones. And it is surely unreasonable to infer that Meadow has continued for all this time to disable itself by not filling a position that it needs, just as a pretext to avoid liability to Larsen. Meadow's desire to cut costs must be credited as an independent basis for not filling the position for which Larsen applied, and there is no evidence (either direct or by way of reasonable inference) to suggest that Meadow's economic

---

ing on *Anderson*, 477 U.S. at 249–50, 106 S.Ct. at 2510–11) for the proposition that a "scintilla of evidence" or "merely colorable" evidence is insufficient to defeat a Rule 56 motion. That may be so, but it does not accurately describe Condie's testimony.

20. Our Court of Appeals has often reemphasized the unfettered right of an employer to make employment decisions without judicial interference so long as those decisions are untainted by any statutorily prohibited motivation. Here, omitting internal quotation marks and citations, is a recent representative restatement in the comparable ADEA context (*Kralman v. Illinois Dept. of Veterans' Affairs*, 23 F.3d 150, 156–157 (7th Cir. 1994)):

We do not sit as a super-personnel department that reexamines an entity's business decisions. No matter how medieval a firm's practices, no

matter how high-handed its decisional process, no matter how mistaken the firm's managers, [the ADEA does] not interfere. Rather, our inquiry is limited to whether the employer gave an honest explanation of its behavior.

Thus, the issue of pretext does not address the correctness or desirability of reasons offered for employment decisions. Rather, it addresses the issue of whether the employer honestly believes in the reasons it offers. The ADEA cannot protect older employees from erroneous or even arbitrary personnel decisions, but only from decisions which are unlawfully motivated.

21. As already stated, that is equally true of the Exchange job for which Larsen applied but was not hired.

motivation has been offered as an after-the-fact pretext.

Thus under the *Price Waterhouse* formulation it must be held that even when Condie's version is credited, Larsen would not have been hired in any event for a perfectly legitimate and nonactionable reason. And if the *McDonnell Douglas–Burdine* approach were to be applied, the result would be the same: That economic reason must be held to be non-pretextual. Hence either way Larsen also loses on the Meadows claim as a matter of law.

### 3. *Separation Form*

█ Finally there is Larsen's claim that the unflattering reasons for leaving Lakeshore indicated on her separation form ("quit—dissatisfied—walked off the job") also constitute retaliatory treatment. Clubs acknowledge that the form was incorrectly filled out. But what Larsen has done is simply to tender the separation form and then ask this Court to intuit that the stated reasons were selected by whoever filled it out in retaliation for her being a plaintiff in *Avitia*—she has offered absolutely no other evidence to support that contention.

What Larsen prefers to ignore is that those notations were made roughly a year after she left Lakeshore and more than two years after she joined the *Avitia* litigation. Moreover, the form was never circulated to anyone else: It came to light only when discovery took place in this action. In sum, Larsen has not (even with the benefit of reasonable favorable inferences) provided the necessary "causal link" between her *Avitia* participation and the erroneous form. Clubs are also entitled to summary judgment on that aspect of Larsen's claim.

### Conclusion

There is no genuine issue of material fact on any of Larsen's claims, and Clubs are entitled to judgment as a matter of law on the entirety of those claims. This action is dismissed with prejudice.