**Sherri E. HITE Plaintiff,**

v.

**BIOMET, INC., Defendant.**

No. 1:98–CV–0022.

United States District Court,
N.D. Indiana,
Fort Wayne Division.

March 3, 1999.

C. Erik Chickedantz, Hawk, Haynie, Gallmeyer and Chickedantz, Fort Wayne, IN, for C. Erik Chickedantz, mediator.

Cynthia Rockwell, Haller and Colvin, Fort Wayne, IN, for Sherri E. Hite, plaintiff.

Thomas M. Kimbrough, Barrett and McNagny, Fort Wayne, IN, for Biomet, Inc., defendant.

### MEMORANDUM OF DECISION AND ORDER

WILLIAM C. LEE, Chief Judge.

On January 16, 1998, plaintiff, Sherri E. Hite ("Hite") filed her complaint against

Defendant Biomet, Inc. ("Biomet") alleging violations of the Family and Medical Leave Act of 1993 ("FMLA"), 29 U.S.C. § 2617, the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12111, *et seq.*, and the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. § 1132. Hite contends that Biomet retaliated against her after she took medical leave under the FMLA by subjecting her to a hostile work environment and terminating her employment; retaliated against her on the basis of her disability; intentionally interfered with her right to certain short term and long term disability benefits; and wrongfully denied her claims for medical and disability benefits. Biomet denies discriminating against or interfering with Hite's rights and contends that it properly denied Hite the benefits she seeks to recover in this lawsuit.

Presently before the court is Biomet's Motion for Summary Judgment together with its Brief in Support and accompanying appendices, filed on October 21, 1998. On November 20, 1998, Hite responded by filing her Brief in Opposition to the Motion for Summary Judgment and appropriate supporting materials to which Biomet replied on December 14, 1998.

After reviewing the parties' briefs, this court entered an Order dated February 16, 1999 requesting further briefing by the parties regarding plaintiff's claim that she was subjected to a hostile work environment following her return to work after taking FMLA leave. In particular, the court requested additional briefs on whether the instances of alleged retaliation creating the hostile environment, as alleged by Hite, were sufficient to state a claim for FMLA retaliation. Thereafter, on February 25, 1999, Hite filed her supplemental cross-brief on this issue. One day later, on February 26, 1999, Biomet filed its supplemental brief addressing this issue.

For the following reasons, Biomet's Motion for Summary Judgment will be DENIED as to Hite's FMLA retaliation claim arising out of her first FMLA leave and GRANTED with respect to all remaining claims.

## FACTUAL BACKGROUND

Hite commenced her employment with Biomet on August 16, 1982 and was continuously employed by Biomet until her termination in August, 1996. Immediately preceding Hite's termination she worked as a "return goods clerk." The events giving rise to the present action involve Hite's pregnancy and her decision to take medical leave after terminating the pregnancy in January, 1996.

Hite learned she was pregnant during the fall of 1995. Due to her age, plaintiff's OB/GYN, Dr. Keith Davis, ("Dr.Davis") advised Hite to undergo genetic testing of her fetus. Hite agreed to undergo the genetic testing and an ultrasound. The tests revealed that the fetus suffered from a chromosomal disorder, Trisomy 18, which causes Edwards Syndrome.[1] According to Hite, Dr. Davis informed her that this chromosomal disorder would likely result in death to her child, either before birth or shortly thereafter. Further, Dr. Davis told Hite that if she carried the baby to term, it would be unable to swallow or eat. As a result of this diagnosis, Dr. Davis advised Hite that in his medical opinion she should have an elective delivery of a nonviable fetus rather than continue the pregnancy to term. (Davis Aff., ¶ 3).

After consulting with the child's father and with Dr. Davis, Hite decided to

---

1. Stedman's Medical Dictionary, 25th Edition (1990), describes Edward's Syndrome as:

 a variable syndrome of malformations in infants with 47 chromosomes, the extra chromosome being of group E, no. 18, which is usually fatal within two to three years; more than 30 signs have been described, including mental retardation, abnormal skull shape, low-set and malformed ears, small mandible, cardiac defects, short sternum, diaphragmatic or inguinal hernia, Meckel's diverticulum, abnormal flexion of fingers, and dermatoglyphic anomalies.

electively terminate her pregnancy. On January 23, 1996, Hite delivered a still born baby boy at Lutheran Hospital. Thereafter, Dr. Davis placed Hite on medical leave from Biomet. As a result of the medical procedure and corresponding leave, Hite submitted a claim for health and disability benefits to Biomet. Biomet denied both claims.

Jack Heeter ("Heeter"), Biomet's benefits manager, is the individual responsible for making decisions and interpreting plan provisions relating to Biomet's health and short term disability plans. (Heeter Dep. p. 74). According to Heeter, he denied coverage for Hite's medical procedure pursuant to the terms of the health plan which specifically excludes from coverage "[s]ervices for an abortion and any complications therefrom, except in cases of rape, incest, or if it is medically determined that the life of the mother would be threatened by carrying the child to term." (Summary Plan Description, Appendix to Plaintiff's Response 9 ("Appendix"), Exh. 8). Heeter testified that he made the decision to deny coverage after reviewing the insurance claim form submitted by Dr. Davis which indicated that the services provided were services for an "induced abortion."[2] In addition, Heeter testified that he reviewed Hite's medical records, the diagnosis codes, and Hite's pregnancy chart before concluding that the procedure was not covered under the plan. (Heeter Dep. pp. 43–44, 50–51). Heeter stated that although the summary plan description provides no definition of "abortion," he utilized his own experience and interpretation of the term when denying the claim.[3] After reviewing all of this information and interpreting the appropriate plan provisions, Heeter con-

cluded that Hite's life was not threatened by a continuation of the pregnancy to term and denied coverage. Following his conclusion, Heeter sent Hite a letter, dated March 19, 1996, indicating that he had denied coverage for both her short term disability and medical benefit claims pursuant to the terms of the Biomet Health Plan. (Appendix, Exh. 9).

Thereafter, on April 2, 1996, Heeter received a letter from Dr. Davis regarding the denial of Hite's benefit claims. In this letter Dr. Davis indicated that "I suppose a continuation of the pregnancy would have been possible, but this would have placed the mother at increased risk for several complications of pregnancy, including pre-eclampsia, toxemia, diabetes, and macrosomia, and possibly Cesarean section." Heeter testified that he received this letter but did not interpret the above passage as an indication that Hite's life was at risk if she continued the pregnancy. (Heeter Dep. p. 117; Dep. of Darlene Whaley, p. 30, hereafter "Whaley Dep. p. ___"). Accordingly, he did not alter his decision to deny benefits.

On February 23, 1996, Hite returned to work following her medical leave of absence. It appears that Biomet designated this leave time as FMLA leave, although neither parties' statement of genuine issues refers to it as such. Prior to having the medical procedure and taking the leave of absence, Hite stated that she discussed her pregnancy with co-workers and her supervisor. Hite testified that her supervisor, Herschel Walters ("Walters") commented negatively to her about the fact that she was pregnant at her age and not

2. When filling out insurance forms, physicians utilize a coding system approved by the American Medical Association ("AMA") to indicate the type of procedures performed on a patient. These codes, known as CPT codes, can be interpreted by insurance providers with the aid of the AMA CPT Reference Book. According to Heeter, the insurance form filled out by Dr. Davis contained the CPT code 59850, which as translated by the AMA CPT

Reference Book indicates that the procedure was "induced abortion."

3. For instance, Heeter testified that although miscarriages would technically fall under the category of abortions, he would not deny coverage in such a case. In such cases, Heeter stated that presumptively the mother's life would be at stake due to the strong risk of infection.

married. Hite also indicated that she told a co-worker, Susan Freedle ("Freedle") in confidence about the complications she was having with the pregnancy. According to Hite, Freedle did not keep her confidence and told others at Biomet about these complications.

Upon her return to work after the medical leave, Hite testified that she encountered a hostile working environment. Hite stated that she returned to find a co-worker sitting at her desk. Hite testified that Walters moved her into a smaller space that had no space for her to hang her coat or purse. She testified, "I didn't have my job; I didn't have my desk; I was pushed into a cubbyhole." In addition to her change in location, Hite testified that her job responsibilities changed in that Walters assigned her the hardest and most time consuming credits. Hite also testified that Walters treated her rudely and coldly as did her other co-workers. Specifically, Hite stated that Walters would give her directives such as "get over there and sit down" and would answer Hite's questions rudely by telling her to "shut up and do her job." Hite testified that she spoke to Walters about his treatment of her following her leave, but the situation did not improve. Hite did not further report these events to Walters' supervisor.

Three weeks into Hite's return from the original medical leave, Hite's family practitioner, Dr. Strycker, placed her on a second medical leave of absence due to the stress and anxiety created at work. Dr. Strycker released Hite to return to work in April, 1996. However, upon her return to work, Hite testified that Walters continued his rude behavior. As a result, Hite worked only one day before Dr. Strycker placed her back on a medical leave of absence.

During these latter two leaves of absence, Hite applied for short-term disability benefits offered by Biomet. The Biomet Short Term Disability plan offers employees short term disability income of 60% of the employee's average weekly earnings for up to 26 weeks. Hite sought medical care for depression and received short term disability leave continually throughout both of these leaves of absence. Further, during these leaves Biomet considered Hite to be on an excused leave of absence. Heeter did not make any decisions regarding Hite's employment status with Biomet, rather, Darlene Whaley ("Whaley"), from the human resources department, was responsible for making decisions regarding Hite's employment status. However, Heeter and Whaley interacted regularly concerning Hite's status since Hite would only receive an excused absence for the time she was under a physician's care for her disability.

On May 30, 1996, during Hite's third leave of absence, Dr. Strycker sent Heeter a medical leave of absence form for Hite indicating that she was to continue her medical leave indefinitely. (Appendix Exh. 18). Heeter received this information and determined that it was unacceptable because it is Biomet's practice to require a definitive return to work date in order to pay short-term disability payments and continue her excused absence. (Whaley Dep. p. 71). For this reason, Heeter sent a letter, dated May 31, 1996, to Strycker indicating that the indefinite leave period was unacceptable and requesting that he submit a new medical leave of absence slip limiting the medical leave to the date of Hite's next reevaluation or recheck date. Dr. Strycker then forwarded to Heeter a medical slip, dated July 23, 1996, which stated "remain off work until 8–5–96 when [patient] has [appointment] here." Heeter stated that he did not notify Hite of his correspondence with Dr. Strycker regarding definite recheck dates. Because Hite had been on a leave of absence previously, Heeter believed she understood that she was to return to work by the recheck date on her leave slip unless otherwise indicated by a physician. Hite testified that Dr. Strycker mentioned to her that Biomet would not

accept an indefinite leave date but indicated to Hite that he was working out the details of her leave with Biomet.

On August 5, 1996 Hite failed to attend her scheduled appointment with Strycker. Hite did not notify Biomet of her failure to attend the appointment nor did Biomet receive any information from Strycker indicating that Hite should remain on medical leave. Because of this absence of information, Biomet assumed that Hite would be returning to work in line with company policy. Heeter's notes and deposition testimony reflect that he contacted Dr. Strycker's office on August 6 and was told that Hite had failed to keep her August 5 appointment and had not rescheduled. (Heeter Dep. Exh. 33; Heeter Dep., pp. 201–202). Heeter's notes and testimony also reflect that he made a second call to Dr. Strycker's office on August 9 at which time he was informed that Hite had not rescheduled her appointment and that Dr. Strycker was "unable to certify the continuation of her disability." (*Id.*). Hite does not dispute that she failed to attend her appointment and did not immediately reschedule it. (Hite Dep. p. 110).

Given this information, when Hite did not return to work for three consecutive days and failed to notify Biomet of the reason for her failure to report to work, Whaley terminated her employment pursuant to Biomet's "no-call/no-show" policy. This policy, contained in the Biomet Team Member Handbook, states "any team member who fails to notify his or her supervisor of three (3) consecutive days of absence will be automatically terminated on the third day." (Appendix Exh. 23). For purposes of Hite's employment status. Whaley stated that she interpreted Dr. Strycker's last medical slip as indicating a return to work date of August 5, 1996. (Whaley Dep. p. 78). Whaley testified that she decided to terminate Hite after receiving information from Heeter that Hite failed to attend her appointment and that he had not received any documentation

continuing her disability. (Whaley Dep. p. 76).

Biomet did not inform Hite immediately that she was terminated or that her short term disability benefits were terminated. Hite testified that she stopped receiving a short term disability check and contacted Biomet on August 19, 1996 to inquire about her checks. At that time, Whaley informed Hite of her termination. Whaley followed up this conversation with a letter, also dated August 19, explaining Hite's termination and enclosing a check for her remaining vacation days.

### APPLICABLE STANDARD

Summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R.Civ.P. 56(c). However, Rule 56(c) is not a requirement that the moving party negate his opponent's claim. *Fitzpatrick v. Catholic Bishop of Chicago*, 916 F.2d 1254, 1256 (7th Cir.1990). Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery, against a party "who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and in which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 2552–53, 91 L.Ed.2d 265 (1986). The standard for granting summary judgment mirrors the directed verdict standard under Rule 50(a), which requires the court to grant a directed verdict where there can be but one reasonable conclusion. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250, 106 S.Ct. 2505, 2511, 91 L.Ed.2d 202 (1986). A scintilla of evidence in support of the nonmoving party's position is not sufficient to successfully oppose summary judgment; "there must be evidence on which the jury could reasonably find for the plaintiff." *Id.* at 2512; *North Am. Van Lines, Inc. v.*

*Pinkerton Sec. Sys., Inc.,* 89 F.3d 452, 455 (7th Cir.1996); *In Re Matter of Wildman,* 859 F.2d 553, 557 (7th Cir.1988); *Klein v. Ryan,* 847 F.2d 368, 374 (7th Cir.1988). No genuine issue for trial exists "where the record as a whole could not lead a rational trier of fact to find for the non-moving party." *Juarez v. Ameritech Mobile Communications, Inc.,* 957 F.2d 317, 322 (7th Cir.1992) (quoting *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 586, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986)).

## DISCUSSION

### I. *ERISA Claims*

Hite alleges several claims, both substantive and procedural, against Biomet arising under ERISA. As for the substantive claims, Hite first contends that Biomet intentionally interfered with her short and long term disability benefits by terminating her employment and by creating a hostile work environment for Hite in an attempt to force her to voluntarily relinquish her employment. Second, Hite contends that Biomet wrongfully denied her medical and short term disability benefits in January, 1996, after she received the aforementioned medical procedures associated with her pregnancy. With regard to the procedural claims, Hite argues that Biomet wrongfully terminated her short term disability benefits in August, 1996, without notice or an opportunity for review before her employment was terminated. In addition, Hite contends that Biomet failed to furnish information concerning covered ERISA plans within 30 days of her request as required by ERISA. These arguments shall be address separately.

### A. *Interference with Short and Long Term Disability Benefits*

As outlined above, Hite argues that Biomet interfered with Hite's attainment of short term and long term disability benefits by wrongfully terminating her employment. Biomet's response is two-fold. First, Biomet argues that its short term

disability plan is not an "employee welfare benefit plan" under ERISA but rather a "payroll practice" not covered by ERISA's broad scope. In the alternative, Biomet contends that even if the plan was covered by ERISA, Hite cannot show that she was terminated for a pretextual reason as required by the *McDonnell Douglas* burden-shifting approach utilized in ERISA interference cases.

■ Section 510 of ERISA provides, in pertinent part:

> It shall be unlawful for any person to discharge, fine, suspend, expel, discipline, or discriminate against a participant or beneficiary for the purpose of interfering with the attainment of any right to which such participant may become entitled under the plan....

In order to recover under section 510, an employee must show that the employer terminated her with the specific intent to interfere with her ERISA rights. *See Teumer v. General Motors Corp.,* 34 F.3d 542, 550 (7th Cir.1994); *Meredith v. Navistar Int'l Transp. Co.,* 935 F.2d 124, 126 (7th Cir.1991). Plaintiff may satisfy this burden by presenting sufficient evidence, either circumstantial or direct, of intent to interfere with her protected benefits or she may establish the prohibited intent by traversing through the burden-shifting analysis first set forth in *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). *See also Grottkau v. Sky Climber, Inc.,* 79 F.3d 70, 73 (7th Cir.1996); *Little v. Cox's Supermarkets,* 71 F.3d 637, 642 (7th Cir.1995). In this case, Hite relies upon the burden-shifting approach to show the prohibited intent. However, before addressing the merits of the burden-shifting approach as presented by the facts *sub judice,* the court must first address Biomet's argument regarding the scope of ERISA. According to Biomet, Hite has no claim for interference with short term disability benefits because Biomet's plan is a "payroll prac-

tice" exempt from ERISA. In contrast, Hite argues that the plan constitutes an "employee benefit plan" subject to ERISA.

As defined, an "employee welfare benefit plan" is:

> any plan, fund, or program which . . . is . . . established or maintained by an employer or by an employee organization, or by both, to the extent that such plan, fund, or program was established or is maintained for the purpose of providing for its participants or their beneficiaries, through the purchase of insurance or otherwise, (A) medical, surgical, or hospital care or benefits, or benefits in the event of sickness, accident, disability, death . . . .

29 U.S.C. § 1002(1). There is no doubt, and the parties agree, that the plan in question here was established to provide benefits in the event of a disability. However, as Biomet points out, some plans providing for these kinds of benefits are exempted as "payroll practices" from the scope of ERISA. 29 C.F.R. § 2510.3–1(b)(2) provides as follows:

> (b) for purposes of title I of the Act and this chapter, the terms "employee welfare benefit plan" and "welfare plan" shall not include . . .
>
> (3) Payment of an employee's normal compensation, *out of the employer's general assets,* on account of periods of time during which the employee is physically or mentally unable to perform his or her duties, or is otherwise absent for medical reasons (such as pregnancy, a physical examination or psychiatric treatment). . . .

(emphasis added). According to Biomet, the short term disability benefits at issue are paid solely out of its general assets. (Affidavit of Jack Heeter, ¶ 4, hereafter "Heeter Aff." ¶____). As a result, Biomet urges this court to conclude that the plan is a "payroll practice" and not an employee benefit plan. Hite, on the other hand, grounds her argument in the portion of the exception which requires "payment of an

employee's normal compensation." Under her analysis, the short term disability plan at issue provides only 60% of the employee's normal compensation. Thus, she argues that since the short term disability plan does not fully compensate the employee by paying 100% of the employee's normal compensation, it does not qualify for the payroll practice exemption.

■ The court notes that neither party submitted any case law relating to these arguments but relies solely upon the statutory language and their own arguments. However, from the court's own review of this issue it is clear that Hite's position is not well-taken. In *Williams v. Great Dane Trailer Tennessee Inc.,* 1995 WL 447268, *1 (W.D.Tenn., January 20, 1995), the court was presented with the identical argument made by Hite regarding a short term disability plan. In that case, like this one, it was uncontested that the short-term disability benefits were paid out of defendant's general assets, and not out of a special trust or fund. In addition, it was also undisputed that the plan provided all qualifying employees with benefits of only $135 a week, not their normal compensation. The plaintiff argued that because the plan provides benefits in an amount less than plaintiff's normal compensation, the plan did not fall within the payroll practices exemption to ERISA. In rejecting this argument, the court set forth the following in support of its conclusion:

> The Department of Labor has issued several opinion letters, however, in which it has found plans which provide less than an employee's normal compensation to be payroll practices. See, e.g., Department of Labor PWBP Opinion Letter 93–27A, 1993 WL 421012 (Oct. 12, 1993); Department of Labor PWBP Opinion Letter 93–20A, 1993 WL 323133 (July 16, 1993); Department of Labor PWBP Opinion Letter 92–18A, 1992 WL 328699 (Sept. 30, 1992) (all available on WESTLAW FPEN–ERISA database). The Department's position is that providing benefits equivalent to an employ-

ee's normal compensation is not a minimum requirement for the exemption, but a maximum cap. Payment of less than normal compensation from an employer's general assets, therefore, can constitute an employer payroll practice exempt from ERISA. See *Martin Marietta Energy Sys., Inc. v. Industrial Comm'n of Ohio*, 843 F.Supp. 1206, 1211 (S.D.Ohio 1994) (finding disability benefits constituted a payroll practice even though they amounted to less than employee's regular wage). See also *Abella v. W.A. Foote Memorial Hosp., Inc.*, 740 F.2d 4, 5 (6th Cir.1984) (noting that the "administrative interpretation of a statute by those entrusted with its enforcement is entitled to great weight" in finding sick leave benefits not covered by ERISA).

Given this authority and the lack of any contrary authority presented by the Hite, the court finds the reasoning in *Williams* persuasive and concludes that Biomet's short term disability plan is a payroll practice and not an employee benefit plan as defined in the regulations. For this reason, the plan is not subject to ERISA's requirement and Hite cannot maintain a § 510 claim based upon interference with her short-term disability benefits.[4]

The resolution of the above issue leaves the court with plaintiff's remaining § 510 claim of interference[5] with her long term

disability benefits. In the section 510 context, this approach requires that Hite establish a prima facie case of interference by demonstrating that she (1) belongs to the protected class; (2) was qualified for her job position; and (3) was discharged or denied employment under circumstances that provide some basis for believing that the prohibited intent to retaliate was present. See *Grottkau*, 79 F.3d at 73; *Little*, 71 F.3d at 642. Once the plaintiff establishes a prima facie case of interference, the burden shifts to Biomet to offer a legitimate, non-discriminatory reason for the challenged employment action. *Id.* If Biomet presents a legitimate reason, the burden then shifts back to Hite to demonstrate that the proffered explanation is pretextual and that the "motivating factor behind the termination" was the specific intent to interfere with the plaintiff's ERISA rights. See *Meredith*, 935 F.2d at 127.

■ Biomet contends, without conceding that Hite has met the elements of a prima facie case, that even if Hite demonstrates a prima facie case for a section 510 claim, she cannot show that the proffered non-discriminatory reason for terminating her was a pretext. Biomet states that it terminated Hite for failure to call-in to work after three consecutive unex-

---

4. Plaintiff also fails to state a claim regarding her short term disability benefits under 29 U.S.C. § 1133 for defendant's alleged failure to comply with those provisions. This section provides that a participant or beneficiary is entitled to adequate written notice and an opportunity to review a denial of benefits. According to plaintiff, Biomet violated this section by failing to provide notice to Hite of the discontinuation of her short term disability benefits and affording her an opportunity for a full and fair review. However, as noted above, Biomet's short-term disability plan is not an ERISA plan and consequently, is not subject to the regulations contained within ERISA. Thus, this claim fails.

5. With respect to this issue, the parties appear to be reading from different chapters of the same book. Section 510 prohibits both *retaliating* against a plan participant for exercising

rights under an ERISA plan and also *interfering* with a plan participant's future entitlement to rights under a plan. In its motion for summary judgment, Biomet's arguments focus on whether Biomet *retaliated* against Hite for the exercise of her ERISA rights. As a result, it argues that since she was not exercising her rights under the long term disability plan because she was not qualified to do so, there could be no retaliation. Hite's argument relates to the interference provisions. Under her theory, Biomet interfered with her prospective rights in the long term disability benefits by terminating her before she had an opportunity to qualify for such benefits. Although the court concludes that under either theory Hite has failed to demonstrate pretext, the court shall focus on Hite's theory of her case.

cused absences in accordance with the policy set forth in the Team Member Handbook for Biomet employees. Terminating an employee in accordance with a company policy is a legitimate nondiscriminatory reason. Accordingly, the burden of production now shifts back to Hite to demonstrate that the proffered reason is a pretext for interfering with her long-term disability rights.

■■■ To demonstrate pretext, Hite must demonstrate that the proffered reason is "a lie, specifically a phony reason for some action." *Russell v. Acme–Evans Co.,* 51 F.3d 64, 68 (7th Cir.1995). Three avenues are available to Hite to demonstrate pretext: (1) the proffered reasons are factually baseless; (2) the proffered reasons were not the actual motivation for the [adverse employment action] or (3) the proffered reasons were insufficient to motivate the [adverse employment action]. *Wolf v. Buss (America) Inc.,* 77 F.3d 914, 919 (7th Cir.1996). It is not sufficient, however, for the employee to show that the employer acted incorrectly or undesirably by firing him; rather the employee must show that the employer did not honestly believe in the reasons it gave for firing him. *McCoy v. WGN Continental Broadcasting Co.,* 957 F.2d 368, 373 (7th Cir.1992) (citations omitted). This court "does not sit as a super-personnel department that reexamines an entity's business decisions. The question is not whether the [employer] exercised prudent business judgment, but whether [the employee] has come forward to refute the articulated, legitimate reasons for his discharge." *Dale v. Chicago Tribune Co.,* 797 F.2d 458, 464 (7th Cir.1986).

Hite's theory regarding pretext is, essentially, that her termination was a well-planned orchestration by Biomet to terminate her employment under the guise of a legitimate nondiscriminatory reason. For instance, Hite argues that Biomet had notice that she was on an "indefinite" leave of absence because of the May 30, 1996 leave slip from Dr. Strycker indicating that the

Hite should be off work "indefinitely." According to Hite, "Heeter affirmatively acted to change Dr. Strycker's 'indefinite' period to a recheck date that Defendant later used for the sole purpose of terminating Plaintiff's employment and benefits." (Response, p. 5). Hite claims that she was never informed by anyone from Biomet that Dr. Strycker had changed that indefinite period to a "recheck" date and, furthermore, even if she were informed she had no notice that a "recheck" date and a return to work date had the same meaning. Thus, she argues that when she missed her recheck appointment with Dr. Strycker she was unaware that she would be terminated for failing to report to work. Moreover, because Biomet knew she was on an indefinite leave, Hite contends she should not have been terminated for failing to report to work. Hite also contends that Biomet's proffered reason is incredible because there exists "no written employee rule requiring plaintiff to show up for work or call if she missed a doctor's appointment while she was on short term disability leave." (Response, p. 4). Finally, Hite argues that even if she had reported to work on August 5, the company would not have permitted her to return to work because her treating physicians did not provide her with written notice that she could return to work as required in the employee handbook.

In response to these arguments, Biomet presents undisputed evidence of the written no call/no show policy and deposition testimony from Whaley which indicates that Biomet routinely applied this policy to persons who failed to call in after three unexcused absences. (Whaley Dep. p. 96). Indeed, Whaley testified that she has terminated numerous individuals for violating the policy. (Whaley Dep. pp. 96–104). In addition, Heeter testified that it is a uniform practice to require a specific recheck or return to work date for payment of short term disability benefits. (Heeter Dep. p. 136). Thus, Biomet contends that requesting Dr. Strycker to state a "re-

check" date is not evidence of pretext since it is in accordance with company policy. Finally, Heeter testified that he contacted Dr. Strycker's office regarding Hite's failure to report to work and was informed that Hite did not attend her scheduled appointment. Accordingly, Heeter testified that he assumed Hite was no longer under a disability and could return to work.

■ Accepting the facts most favorably to Hite, the court finds that no reasonable juror could conclude that Biomet's reason is a pretext for interfering with her ERISA rights. While Hite does articulate a tenable factual scenario, what she has not presented is evidence that Biomet conducted itself in a manner which demonstrates that its given reason is a lie. There is no evidence before the court that Biomet invented the company practices which it used to terminate Hite; indeed, the uncontroverted evidence is that Biomet has a no call/no show policy and has utilized it. (Whaley Dep. p. 96). Similarly, there is no evidence that Biomet utilized the recheck date as a mechanism to "trick" Hite into not reporting for work. Again, as Heeter testified, a recheck date was required in order for him to continue paying Hite short term disability benefits. Finally, the most compelling evidence supporting this court's conclusion lies in the July 23, 1996 note Biomet received from Dr. Strycker stating that Hite was to "remain off work until 8–5–96 when patient has appointment here." Prior to Hite's termination this is the last correspondence Biomet received from Dr. Strycker regarding Hite's disability. It is undisputed that Hite did not attend her August 5, 1996 appointment. Biomet contacted Dr. Strycker's office on two occasions after the August 5 scheduled appointment and learned that she had not rescheduled her appointment. Biomet also learned after calling Dr. Strycker's office the second time that he was unable to continue certifying her disability. (Heeter Dep. p. 201–205). The sum of these facts leads the

court to the simple conclusion that, while perhaps Hite was mistaken as to her responsibilities during her leave period and the meaning of recheck dates, there is no evidence that Biomet's reason for terminating her was disingenuous. Because this court does not sit as a "super-personnel department" to determine whether an employer exercises prudent judgment, the court concludes that Hite has not demonstrated that Biomet's proffered reason is a pretext for interfering with her right to receive long term disability benefits.

This court's conclusion remains unchanged by Hite's attempt to analogize her claim to the one presented in *Salus v. GTE Directories Service Corp.*, 104 F.3d 131, 135–36 (7th Cir.1997). In *Salus*, the district court concluded that GTE terminated Salus in order to interfere with his protected ERISA rights. In that case, Salus did not report to work due to several medical conditions involving job-related stress. GTE terminated Salus' employment because he had failed to report to work or call in for three days in violation of GTE's unwritten job abandonment policy. After a bench trial, the court held that GTE's reason for terminating Salus was pretextual.

Although Hite attempts to analogize her situation to that of Salus, the value of the *Salus* holding lies in the clear distinction between the operative facts in *Salus*, which the district court and the Seventh Circuit found telling, and those presently before the court. In *Salus*, the court determined that GTE was aware of Salus' medical condition and the duration of Salus' leave because Salus' physician contacted GTE to inform it that he was receiving medical care and would not be reporting to work. Secondly, the court disbelieved GTE's assertion that it had a long-standing job abandonment policy based upon contrary testimony from two former GTE employees. Finally, the court found significant the fact that Salus would have qualified for short term disability benefits

either the day of, or one day after, he was terminated.

Unlike *Salus*, in this case, Hite has presented no evidence that Biomet's written no show/no call policy was not uniformly enforced. Indeed, the uncontroverted evidence, and Hite's own testimony, demonstrate that the policy existed, employees, including Hite, were aware of the policy, and the policy was uniformly enforced. (Whaley Dep. p. 96–104; Hite Dep. p. 114). Moreover, while Hite contends that Biomet was "aware that Plaintiff would not be returning to work on August 5, 1998," the last medical leave slip sent to Biomet by Dr. Strycker indicates a return to work date of August 5, 1998. This evidence sharply contrasts the situation in *Salus*, where the physician contacted the employer directly to communicate that Salus would not be returning to work during the time in question. Here, the evidence is the polar opposite. Biomet believed Hite would be returning to work on August 5 unless it received an updated medical leave slip from Dr. Strycker. Biomet received no medical slips from Dr. Strycker's office after August 5 and telephone calls to his office indicated that none would be forthcoming since Hite failed to attend her appointment or reschedule it. Finally, unlike *Salus*, where the court drew an inference of discrimination from the fact that Salus' termination occurred one day before he would qualify for disability benefits, here, Hite was receiving short term disability benefits at the time she was terminated and was at least a month away from qualifying for any long term disability benefits. Thus, none of the material facts contained in *Salus* exist in the present case to warrant a denial of summary judgment. Accordingly, this court GRANTS summary judgment on plaintiff's ERISA interference claim.

## B. *Wrongful Denial of Benefits*

■ Hite also argues that Biomet acted improperly in denying her benefits in January, 1996 relating to the termination of her pregnancy. Section 502(a)(1)(B) of ERISA states that "a civil action may be brought by a participant or beneficiary to recover benefits due to him under the terms of his plan, to enforce his rights under the terms of the plan, or to clarify his rights to future benefits under the terms of the plan." § 29 U.S.C. 1132(a)(1)(B). The Seventh Circuit Court of Appeals recently reiterated the standard of review in cases such as the one at hand: "a denial of benefits challenged under [§ 502(a)(1)(B)], is to be reviewed under a de novo standard unless the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan." *Mers v. Marriott International Group Accidental Death and Dismemberment Plan*, 144 F.3d 1014, 1021 (7th Cir.1998) (quoting *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 115, 109 S.Ct. 948, 103 L.Ed.2d 80 (1989)). Under ERISA, if an insurer reserves discretion to determine the eligibility of an insured for benefits, then the court applies an arbitrary and capricious standard of review. *Firestone Tire & Rubber Co.*, 489 U.S. at 115, 109 S.Ct. 948. The parties in this case agree that Heeter has discretionary authority to determine both eligibility for benefits and to construe the terms of Biomet's medical and short term disability plans. Accordingly, to prevail on its summary judgment motion, Biomet must show that the undisputed material facts demonstrate that Heeter's decision to deny disability benefits is arbitrary and capricious.

■ Under the arbitrary and capricious standard of review, "[i]f the administrator makes an informed judgment and articulates an explanation for it that is satisfactory in light of the relevant facts, then the administrator's decision is final." *Cvelbar v. CBI Illinois Inc.*, 106 F.3d 1368, 1379 (7th Cir.1997); *Chalmers v. Quaker Oats Co.*, 61 F.3d 1340, 1345 (7th Cir.1995) (citing *Pokratz v. Jones Dairy Farm*, 771 F.2d 206, 209 (7th Cir.1985)). The court

must determine not whether the plan administrator's decision is correct or whether the court would have answered the question another way, but instead whether the administrator's interpretation of the plan was unreasonable. *See Mers,* 144 F.3d at 1021 (stating that, under the arbitrary and capricious standard, "it is not our function to decide whether we would reach the same conclusion as the Plan or even rely on the same authority" and that we shall also "not set aside a plan's denial of benefits if the denial was based on a reasonable interpretation of the plan documents"); *Reilly v. Blue Cross and Blue Shield United of Wisc.,* 846 F.2d 416, 420 (7th Cir.), cert. denied, 488 U.S. 856, 109 S.Ct. 145, 102 L.Ed.2d 117 (1988)(The insurer's decision must be considered arbitrary and capricious if it "entirely failed to consider an aspect of the problem, offered an explanation for its decision that runs counter to the evidence before it, or is so implausible that it could not be ascribed to a difference in view...."). In the case *sub judice,* Biomet argues that it offered a reasoned explanation, based on the evidence, for its decision to deny Hite's claim. This court agrees.

At issue is the contract language relating to coverage for abortion services which excludes:

> "[s]ervices for an abortion and any complications therefrom, except in cases of rape, incest, or if it is medically determined that the life of the mother would be threatened by carrying the child to term." (Appendix, Exh. 8).

Hite contends that Heeter's decision was arbitrary and capricious because Heeter "failed to consider all of the relevant factors and exercised a clear error in judgment" (Response, p. 7), when he determined that the procedure was an induced abortion not covered under the Biomet health plan. According to Hite, Heeter's decision was based solely on the CPT code which identified the medical procedure as an induced abortion. Plaintiff also points to Dr. Davis' letter which she argues Heet-er did not properly consider. That letter, she contends, described "the medical necessity of this procedure and the life-threatening complications associated with carrying a baby with Trisomy 18 to term by a mother of plaintiff's age and condition."

For its part, Biomet argues that Heeter properly determined, after reviewing all of the information presented to him, that Hite did not qualify for coverage under the terms of the plan. Heeter testified that prior to denying benefits he reviewed (1) the CPT code selected by Dr. Davis to describe the procedure; (2) Hite's medical records; and (3) Hite's pregnancy charting. He testified that after considering each of these documents, he determined that no medical determination was made that Hite's life was at risk and denied coverage.

■ With respect to this claim, the issue before the court is whether Heeter's decision is reasonable, not whether the record contains evidence which could support a contrary result. *Mers v. Marriott Int'l Group Accidental Death & Dismemberment Plan,* 144 F.3d at 1021. The record in this case contains evidence supporting Heeter's conclusion that Hite's procedure was an induced abortion not medically necessary to Hite's life. Aside from the CPT coding and Hite's medical records, Heeter received Dr. Davis' letter which stated "a continuation of the pregnancy would have been possible, but this would have placed the mother at increased risk for several complications of pregnancy, including pre-eclampsia, toxemia, diabetes, and macrosomia, and possibly even cesarean section." Heeter testified that because the pregnancy could have been continued he did not consider this letter to indicate that Hite's life was threatened. (Heeter Dep. p. 117). Given the totality of the information considered, this court cannot conclude that Heeter's interpretation of the plan as it relates to Hite's claim was unreasonable. Accordingly, his denial of benefits was not arbi-

trary and capricious and summary judgment on this claim is GRANTED.

### C. *Failure to Comply with Plaintiff's Request for Information*

In addition to the above ERISA claims, Hite has also asserted a claim based upon 29 U.S.C. § 1132(c)(1)(B) which provides:

Any administrator who fails or refuses to comply with a request for any information which such administration is required by this subchapter to furnish to a participant or beneficiary (unless such failure or refusal results from matters reasonably beyond the control of the administrator) by mailing the material requested to the last known address of the requesting participant or beneficiary within 30 days after such request may in the court's discretion be personally liable to such participant or beneficiary in the amount of up to $100.00 a day from the date of such failure or refusal, and the court may in its discretion order such other relief as it deems proper.

According to Hite, her attorney sent several written requests to Biomet's plan administrator requesting information supporting Defendant's denial of her benefits. Letters were sent to Biomet on June 19, 1997, July 2, 1997 and on August 7, 1997. However, Hite received no response until August 12, 1997 which was, by her count, 54 days after the initial request and 41 days after the second request.

Of course, Biomet presents what it deems good reasons for the delay. In particular, Biomet argues that Hite's first letter was addressed to Whaley and not the plan administrator.[6] Thus, the letter had to make its way to the plan administrator. The second letter, Biomet contends contained an overly broad request by Hite's attorney requesting "complete copies of the full Plan Documents for all

benefits, including but not limited to the Flexible Benefits Plan and Long–Term Disability Plan, which were available to Ms. Hite while she was employed at Biomet." As a result, Biomet referred the letter to its counsel for review. Finally, Biomet defends its late response by its contention that it was uncertain whether it was required to release the documents to Hite's attorney since ERISA only requires the administrator to furnish documents to a plan participant or beneficiary. *See Bartling v. Fruehauf Corp.,* 29 F.3d 1062 (6th Cir.1994) (ERISA plan and plan administrator not required to disclose plan documents to employee's attorney absent written release signed by employee).

 Given the above circumstances, this court concludes that the purpose of the penalty provision would not be served by imposing a fine on defendant. The purpose of ERISA's penalty provision is "not so much to penalize as to induce plan administrations to respond in a timely manner to a participant's request for information." *Winchester v. Pension Comm. of Michael Reese Health Plan, Inc.,* 942 F.2d 1190, 1193 (7th Cir.1991). In determining whether to award a penalty for disclosure violations under ERISA, a district court should consider the conduct and intent of the administrator in not providing the relevant information, *Kleinhans v. Lisle Sav. & Profit Sharing Trust,* 810 F.2d 618, 622 (7th Cir.1987) and the harm or prejudice suffered by the participant from the administrator's failure to furnish the required information, *Harsch v. Eisenberg,* 956 F.2d 651, 662 (7th Cir.1992). Here, the harm or prejudice to Hite, if any, is minimal and Hite does not suggest in her brief the nature of any prejudice she believes exists. After factoring in postal delays and plaintiff's technical failure to address the "benefits

---

6. Biomet's Health Benefit Plan indicates that the plan administrator is the "Benefits Committee" of which Whaley is a member. Further, the plan also indicates that any questions about the plan should be addressed to

Darlene Whaley. Thus, whether Hite properly addressed the first letter is a technical matter since Whaley is a member of the committee designated as the plan administrator.

committee" in her first request, Biomet's response arrived approximately 9–11 days after the second letter. Further, since Hite is partly responsible for the delay by failing to properly address her request, this court cannot hold Biomet accountable by assessing a fine. *Jones v. UOP*, 16 F.3d 141, 144 (7th Cir.1994) (When a plan designates a plan administrator, document requests must be addressed to that entity and requests addressed to the employer's legal department will not trigger civil penalties). Second, plaintiffs failed to make any showing of bad faith. Defendants position was based on a good faith argument that ERISA did not require the disclosure of plan documents to Hite's attorney without a written authorization. Accordingly, this court determines that assessing fines in this case would not serve ERISA's policies to award statutory penalties and Biomet's motion for summary judgment on this claim is GRANTED.

## II. *ADA Claim*

Next, Hite contends that Biomet discharged her in violation of the ADA. Only a "qualified individual with a disability" enjoys the protections afforded by the ADA. *Bombard v. Fort Wayne Newspapers, Inc.*, 92 F.3d 560, 563 (7th Cir.1996); 42 U.S.C. § 12112(a). Thus, the court must initially determine whether Hite is in this protected class. A qualified individual with a disability is defined, in relevant part, as "an individual with a disability who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires." 42 U.S.C. § 12111(8). The parties disagree as to whether Hite meets this definition.

A two-step process governs the analysis of whether an individual is a "qualified individual with a disability." *Id.* First, Hite must demonstrate that she satisfies the prerequisites for a return goods clerk, i.e., that she has the proper training, skills and experience. *Bultemeyer*, 100 F.3d at 1284. Second, Hite must show

that she could perform the essential functions of a return goods clerk, either with or without reasonable accommodation. *Id.* Whether Hite could perform the essential functions of her job is measured at the time of her discharge. *Id.* Hite bears the burden of proof on this issue, *see DeLuca v. Winer Indus.*, 53 F.3d 793, 797 n. 3 (7th Cir.1995), and must show that "she possessed the necessary skills to perform [her] job, and that [she] was 'willing and able to demonstrate these skills by coming to work on a regular basis." *Nowak v. St. Rita High School*, 142 F.3d 999, 1003 (7th Cir.1998)(quoting, *Tyndall v. National Education Centers, Inc. of Cal.*, 31 F.3d 209, 213 (4th Cir.1994)).

Biomet contends that Hite is not a "qualified individual with a disability" because she has consistently represented throughout the litigation that she is totally disabled and unable to work. In particular, Biomet focuses on Hite's representations on disability forms that she was totally disabled at the time of her termination. Given these representations that she was totally disabled and unable to work, Biomet contends Hite is "speaking out of both sides of her mouth" when she claims she is a "qualified individual with a disability" who can perform the essential functions of her job under the ADA. Thus, under its analysis, Biomet concludes that Hite cannot simultaneously be both unable to work and able to perform the essential functions of her job. In response, Hite asserts that she is a qualified individual because with the reasonable accommodation of both the short term disability leave and the long-term disability leave she could have performed the essential functions of her job.

Two recent cases from the Seventh Circuit shed light on this dispute. First, in *Weigel v. Target Stores*, 122 F.3d 461 (7th Cir.1997), the plaintiff sued her employer for violations of the ADA. After her termination, however, the plaintiff applied for social security disability benefits and certified that she was unable to work. Her employer's argument mirrored that made

by Biomet in the instant case, that is, an employee cannot, for one purpose, represent that she is unable to work and simultaneously represent in a subsequent lawsuit under the ADA that she is able to work. The Seventh Circuit concluded, "because the [Social Security Administration's] definition of disability—as well as those of most disability insurance plans—differs materially from the ADA's definition of a 'qualified individual with a disability,' these representations are not conclusive as to the ADA issue." However, the panel concluded that "absent some such affirmative showing of the plaintiff's ability to perform the essential functions of the position, there will be no genuine issue of material fact as to whether the plaintiff is a 'qualified individual' and the employer will be entitled to judgment as a matter of law." *Weigel,* 122 F.3d at 467–68.

Shortly on the heels of *Weigel,* came the Seventh Circuit's decision in *McCreary v. Libbey–Owens–Ford Co.,* 132 F.3d 1159 (7th Cir.1997). There, the Seventh Circuit reaffirmed its decision in *Weigel* and determined that the plaintiff must come forward with evidence other than the representations made in the disability application which tends to show that the plaintiff, can, with or without reasonable accommodation, perform the essential functions of the job. Because the plaintiff, in that case, demonstrated a genuine issue of material fact as to whether he could perform the essential functions of .the job with a reasonable accommodation, summary judgment was denied. This was true despite McCreary's assertions to the SSA that he was unable to work. *McCreary,* 132 F.3d at 1164; *accord Soto–Ocasio v. Federal Express Corp.,* 150 F.3d 14 (1st Cir.1998).

▮▮▮▮ With these cases set forth, the court is unable to conclude, as Biomet urges, that Hite's representations of disability for the purpose of receiving contractual disability benefits is conclusive evidence that she is not a "qualified individual with a disability." Rather, in line

with *Weigel* and *McCreary,* the court must determine whether Hite has made an affirmative showing that she is able to perform the essential functions of her job with or without a reasonable accommodation. *Weigel,* 122 F.3d at 467–68. To this end, Hite contends that, although she was unable to work at the time of her termination, with the reasonable accommodation of short term and long term disability leave she could have returned to work to perform the essential functions of her job. However, Hite's argument, is not well-taken.

Numerous courts recognize that, "[an] essential element of any ... job is an ability to appear for work..." *Rogers v. International Marine Terminals, Inc.* 87 F.3d 755 (5th Cir.1996) (quoting, *Carr v. Reno,* 23 F.3d 525, 530 (D.C.Cir.1994)); *see also Tyndall v. National Education Centers, Inc. of Cal.,* 31 F.3d 209, 213 (4th Cir.1994)(an employee "who does not come to work cannot perform any of his job functions, essential or otherwise."). The Seventh Circuit also endorses this general proposition. *Nowak v. St. Rita High School,* 142 F.3d 999, 1003 (7th Cir.1998) ("Obviously, an employee who does not come to work cannot perform the essential functions of his job."); *Bombard,* 92 F.3d at 564 (plaintiff's admission in deposition testimony that she was "unable to work" meant plaintiff failed to produce sufficient evidence to establish genuine issue of material fact as to ability to perform essential functions of job with reasonable accommodation); *Tuszkiewicz v. Allen–Bradley Company,* 967 F.Supp. 1119, 1129 (E.D.Wis.1997)(plaintiff who stated that at the time of his discharge he was "unable to work" could not perform the essential functions of his job).

Moreover, in *Nowak,* the Seventh Circuit expressly held that an indefinite leave of absence is not a reasonable accommodation under the ADA:

> The undisputed facts show that Nowak was unable to perform an essential function—regular attendancerequired of a

teacher at St. Rita. Prior to his termination Nowak was absent for more than eighteen months . . .

The undisputed evidence shows that Nowak failed to meet his burden of establishing he was a 'qualified individual with a disability' at the time of his termination. **The ADA does not require an employer to accommodate an employee who suffers a prolonged illness by allowing him an indefinite leave of absence.**

*Nowak*, 142 F.3d at 1003–1004 (citing *Rogers*, 87 F.3d at 759) (emphasis added). In this case, the undisputed evidence reflects that Hite was not able to return to work on August 5, 1996 and had no prospects of returning soon thereafter. Indeed, her own deposition testimony reflects her belief that she is "too depressed to work, I'm suicidal" and that she "cannot work at all." (Hite Dep. p. 164). Thus, Biomet had no obligation under the ADA to reasonably accommodate Hite's prolonged bouts with depression with an indefinite leave of absence.

■■■ Hite argues, nevertheless, that because the short term and long term disability plans permit over two and a half years of disability leave with job protection, Biomet had an obligation not to terminate her, and to accommodate her, while she was on disability leave. However, this argument presupposes that Hite's contract rights and her rights under the ADA are equivalent. This is simply not the case. The ADA applies only to "qualified individuals with a disability." Where an employee is not, under ADA jurisprudence, a "qualified individual with a disability," that employee is not entitled to the benefits and protections of the ADA regardless of whatever other rights, contractual or statutory, that employee may have. In this case, Hite is not a "qualified individual with a disability" under the law as it has developed under the ADA and thus, she cannot rely on the ADA for a source of relief.

Because the court concludes that Hite is not a "qualified individual with a disability"

under the ADA, Biomet's motion for summary judgment is GRANTED as to this claim.

### III. *FMLA Claims*

■■■ The FMLA establishes two categories of protection for employees. First, the FMLA contains prescriptive protections that are expressed as substantive statutory rights. Under these provisions, the Act permits eligible employees of a covered employer the right to take unpaid leave for a period of up to twelve work weeks in any twelve-month period for a serious health condition as defined by the Act. 29 U.S.C. § 2612(a)(1). After the period of qualified leave expires, the employee is entitled to be reinstated to the former position or an equivalent one with the same benefits and terms of employment that existed prior to the exercise of the leave. 29 U.S.C. § 2614(a). To insure the availability of these guarantees, the FMLA declares it "unlawful for any employer to interfere with, restrain, or deny the exercise of or the attempt to exercise, any right provided." 29 U.S.C. § 2615(a)(1). When an employee alleges a deprivation of these substantive guarantees, the employee must demonstrate by a preponderance of the evidence only entitlement to the disputed leave. In such cases, the intent of the employer is immaterial. *See Diaz v. Fort Wayne Foundry Corp.*, 131 F.3d 711, 713 (7th Cir.1997) ("We shall continue to resolve suits under the FMLA by asking whether the plaintiff has established, by a preponderance of the evidence, that he is entitled to the benefit he claims."); see also *Hodgens v. General Dynamics Corp.*, 144 F.3d 151, 159 (1st Cir.1998) ("Because the issue is the right to an entitlement, the employee is due the benefit if the statutory requirements are satisfied, regardless of the intent of the employer.").

The FMLA also contains an "antidiscrimination component." *Diaz v. Fort Wayne Foundry Corp.*, 131 F.3d 711, 713 (7th Cir.1997). As noted, § 2615(a)(1) prohibits an employer from "interfer[ing]

with, restrain[ing], or deny[ing]" the exercise of rights provided under the FMLA. The next subsection proscribes "discharg[ing] or in any other manner discriminat[ing] against any individual for opposing any practice made unlawful" by the FMLA. 29 U.S.C. § 2615(a)(2). Furthermore, "an employer is prohibited from discriminating against employees or prospective employees who have used FMLA leave ... [E]mployers cannot use the taking of FMLA leave as a negative factor in employment actions, such as hiring, promotions or disciplinary actions ..." 29 C.F.R. § 825.220(c).

 "In contrast to what an employee must show to establish a deprivation of a substantive guarantee under the Act, when an employee raises the issue of whether the employer discriminated against an employee by taking adverse action against the employee for having exercised an FMLA right, the question of intent is relevant." *King v. Preferred Technical Group*, 166 F.3d 887, 888 (7th Cir.1999). The issue becomes whether the employer's actions were motivated by an impermissible retaliatory or discriminatory animus. *Id.; see also Hodgens*, 144 F.3d at 159 ("In such a case, the employer's motive is relevant, and the issue is whether the employer took the adverse action because of a prohibited reason or for a legitimate nondiscriminatory reason.").

Against this backdrop, the court turns to Hite's contentions. Plaintiff asserts two separate claims under the FMLA. First, Hite contends that Biomet interfered with her protected medical leave in January, 1996. In particular, she contends that Biomet retaliated against her by subjecting her to a hostile work environment when she returned to work after utilizing her FMLA leave rights. Second, Hite asserts that Biomet discharged her in retali-

ation for exercising her FMLA rights. These claims are set forth in detail below.

### A. FMLA Interference [7] Claim

In her brief, Hite argues, "Plaintiff was on medical leave protected by the FMLA for her own serious health condition after she lost her baby in January, 1996. When plaintiff returned to work in February, she was subjected to an unexplained retaliating hostile environment which Plaintiff can only explain was caused by her exercise of her FMLA benefits." To establish a prima facie case of a retaliation FMLA claim, Hite must demonstrate that (1) she availed herself of a protected right under the FMLA; (2) she was adversely affected by an employment decision; and (3) there is a causal connection between the two actions. *King v. Preferred Technical Group*, 166 F.3d 887 (7th Cir.1999). Once a plaintiff makes such a showing, the employer must articulate an alternative, permissible explanation for the challenged employment decision. If the employer makes this showing, the employee is entitled to proffer evidence that the employer's explanation is pretext for retaliation; that is, that the employer is lying. *McKenzie v. Illinois Dept. of Transp.*, 92 F.3d 473, 483 (7th Cir.1996).

Here, Hite's use of FMLA leave in January, 1996 fulfills the first element of the prima facie case. Therefore, the court will proceed to the second element, which is whether the claimant has suffered an adverse employment action. Hite alleges that she suffered a multitude of retaliatory actions after she returned from her January, 1996 FMLA leave. In particular, she asserts that her desk had been given to another employee with less seniority, she was placed in a cubbyhole of the office that had only a small desk and a computer and did not have a place for her to hang her purse or hat. In addition, she contends

---

7. Although Hite states her claim to be an "interference" claim, when analyzing the merits of her claim, she refers to the claim as one for retaliation and utilizes the *McDonnell* *Douglas* burden shifting approach for retaliation claims. Accordingly, the court shall consider this claim as one for retaliation.

that she was treated rudely and coldly by her supervisor and co-workers, and she was assigned the most time-consuming and hardest credits rather than the typical credits she had been assigned before her medical leave.

The critical question is whether these incidents constitute adverse employment actions for purposes of a retaliation claim. The Seventh Circuit has held that the employment actions must be materially adverse in order to satisfy the second element. *See Rabinovitz v. Pena,* 89 F.3d 482, 489 (7th Cir.1996); *see also Smart v. Ball State Univ.,* 89 F.3d 437, 441 (7th Cir.1996). This requirement is clearly met in cases in which there is an adverse change in the terms and conditions of employment which are "more disruptive than a mere inconvenience or an alteration of job responsibilities" and include "a termination of employment, a demotion evidenced by a decrease in wage or salary, a less distinguished title, a material loss of benefits, significantly diminished material responsibilities, or other indices that might be unique to a particular situation." *Crady v. Liberty Nat'l Bank & Trust Co.,* 993 F.2d 132, 136 (7th Cir.1993); *see also Sweeney v. West,* 149 F.3d 550, 556 (1998) (instances of different treatment are insufficient to establish retaliation if differences have little or no effect on an employee's job).

In this case, Hite has not alleged any retaliatory acts which demonstrate a decrease in wage or salary, a less distinguished title, or a material loss of benefits. However, case law cited by plaintiff also supports plaintiff's contention that moving her work area from a spacious office to a "cubbyhole," assigning her more arduous work, and receiving harassing treatment from co-workers may constitute an adverse action. For instance, in *Knox v. State of Indiana,* 93 F.3d 1327 (7th Cir.1996), the Seventh Circuit affirmed a jury verdict in favor of the plaintiff on her retaliation claim. In *Knox,* the plaintiff contended that her co-workers began a campaign of verbal harassment after being told that Knox had filed a sexual harassment charge against her supervisor. *Id.* at 1331. Once this campaign of harassment began, Knox complained to the affirmative action officer investigating her sexual harassment charge and turned over the names of the individuals making negative comments. At trial, the Defendant contended that the conduct of the co-workers was insufficient to establish an adverse employment action. The Seventh Circuit disagreed. In finding that the plaintiff had produced sufficient evidence of retaliation, the Seventh Circuit stated:

> No one would question the retaliatory effect of many actions that put the complainant in a more unfriendly working environment: actions like moving the person from a spacious, brightly lit office to a dingy closet, depriving the person of previously available support services (like secretarial help or a desktop computer), or cutting off challenging assignments...The law deliberately does not take a 'laundry list' approach to retaliation, because unfortunately its forms are as varied as the human imagination will permit.

*Id.* at 1334. Similarly, in *Smart v. Ball State Univ.,* 89 F.3d 437 (7th Cir.1996), the Seventh Circuit again took a broad approach to the definition of an adverse employment action for purposes of a retaliation claim:

> Adverse employment action has been defined quite broadly in this circuit. In some cases, for example when an employee is fired, or suffers a reduction in benefits or pay, it is clear that an employee has been the victim of an adverse employment action. But an employment action does not have to be so easily quantified to be considered adverse for our purposes. '[A]dverse job action is not limited solely to loss or reduction of pay or monetary benefits. It can encompass other forms of adversity as well.'

*Id.* at 441 (citations omitted); *see also Collins v. State of Illinois,* 830 F.2d 692, 703 (7th Cir.1987)(adverse action found where employee was placed in a new department and assigned to a desk outside her supervisor's office, where a receptionist would typically sit; employee also lost her phone, business cards, and listing in professional directories and publications).

▪ In this case, the court is faced with Hite's uncontested allegations that upon returning from FMLA leave, her work space was moved to a compact area, a person with less seniority was moved into her previous work space, she was assigned the most time-consuming work, and she was treated rudely by Walters and some co-workers. Biomet offers absolutely no explanation for why Hite's work space was moved and presents no affidavit or deposition testimony from Walters disputing Hite's allegations that he treated her rudely or assigned her the most time-consuming work after she returned from leave. Like the Seventh Circuit in *Knox,* this court is convinced that these actions placed Hite in a more unfriendly working environment than she otherwise would have been had she not taken FMLA leave. Thus, crediting Hite's version of the facts and drawing all inferences in her favor, this court finds a genuine issue of material fact exists with respect to whether Hite experienced an adverse employment action sufficient to support a retaliation claim.

In the alternative, Biomet argues that Hite fails to meet the third element of the prima facie case, i.e. demonstrate a causal connection between her first FMLA leave and the alleged hostile environment. In order to satisfy the causal link requirement, Hite must demonstrate that Biomet would not have taken the alleged retaliatory actions against her "but for" her taking FMLA leave. *Johnson v. University of Wisconsin,* 70 F.3d 469, 479 (7th Cir.1995). Hite argues she can establish causation by showing temporal proximity between the protected activity and her discharge. Biomet counters arguing that "timing alone does not create a genuine issue in a retaliation case." *Id.*

▪ It is well-settled that the temporal proximity between protected activity and an adverse action may suffice to demonstrate a causal link for purposes of a prima facie case. *See McClendon v. Indiana Sugars, Inc.,* 108 F.3d 789, 796 (7th Cir. 1997) ("We agree that, under this circuit's established case law, such a closely related sequence of events is sufficient to present a prima facie case."); *see also Davidson v. Midelfort Clinic, Ltd.,* 133 F.3d 499, 511 (7th Cir.1998) ("A 'telling' temporal sequence can establish [the causal] nexus ..., but by telling we mean that the employer's adverse action follows fairly soon after the employee's protected expression.") (citations omitted). Simply stated, the closer in time the alleged adverse action is to the plaintiff's exercise of her protected rights, the more likely it is that the fact finder could conclude that unlawful retaliation is the underlying motive for the adverse action. *See Davidson v. Midelfort Clinic, Ltd.,* 133 F.3d 499, 511 (7th Cir.1998). Conversely, a large period of nonretaliation following protected activity requires a plaintiff to demonstrate additional evidence to support a causal connections between the retaliation and the protected activity. *Id.* ("As the period of time separating the [protected activity and the adverse action] lengthens, the hint of causation weakens."). Thus, the issue is whether the record discloses a telling temporal sequence between Hite's FMLA leave and the allegedly hostile work environment she suffered.

▪ Here, again, this court finds that Hite has presented sufficient evidence to overcome summary judgment and has raised a genuine issue of fact to support a causal connection between her exercise of FMLA rights and the alleged retaliation. Immediately upon plaintiff's return from FMLA leave she was placed in a substantially smaller work area, was given the most difficult work to accomplish, and received abrupt and rude treatment from her

supervisor. In *Johnson v. Sullivan,* 945 F.2d 976, 980 (7th Cir.1991), the Seventh Circuit held that the fact that the employee's discharge took place one day after filing of a lawsuit supported the inference of causation necessary to sustain a prima facie case. Like *Johnson,* Hite contends that the retaliatory actions began on the very day she returned from exercising her FMLA leave. Moreover, each of the alleged retaliatory acts occurred without explanation by Biomet.

Despite this temporal proximity, Biomet contends that there is no evidence of causation because the only derogatory comment made by Walters occurred before Hite took her leave of absence. This argument relates to Hite's deposition testimony in which she stated that prior to taking FMLA leave, Walters expressed hostility toward her for becoming pregnant. However, this argument fails for several reasons. First, Hite also testified that Walters was hostile toward her for having to take small breaks from work during the day as a result of morning sickness associated with her pregnancy.[8] (Hite Dep. p. 57). From this testimony, it is reasonable for a fact-finder to conclude that since Walters was annoyed with Hite for taking small breaks from work, he would be more inflamed by her decision to take FMLA leave for a number of weeks. Second, this argument ignores the other actions Hite complains were taken against her after she returned from FMLA leave, namely the more difficult work load and the change in work space. Given all of these circumstances, this court concludes that Hite raises a genuine issue of fact that a causal connection exists between her FMLA leave and the alleged retaliatory acts. Accordingly, she has raised a genuine issue of

fact regarding the prima facie case of retaliation.

With this resolution, the burden shifts to Biomet to show a legitimate, non-discriminatory, reason for the adverse actions. *Dey v. Colt Constr. & Dev. Co.,* 28 F.3d 1446, 1457 (7th Cir.1994). If Biomet can meet its burden, Hite must then show that the real intent was discriminatory and that any explanations offered by Biomet are just a pretext. *See, e.g., McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). As noted, Biomet has proffered no explanation whatsoever for moving Hite's work space or assigning her harder credits upon her return from FMLA leave. In its supplemental brief, Biomet refers to Hite's allegations that she was assigned more difficult work and, without any citation to any facts in the record, states "...obviously, those assigned tasks were within the duties of her job description, as she had previously been trained for and had previously performed those tasks." Supplemental Brief, p. 5. Moreover, Biomet, again without citation to the record, states: "Plaintiff's characterization that she was 'pushed into a cubbyhole' is terribly misleading and inaccurate, as the work location is in the immediate department, and is in the area where all members of the department have regularly worked at one time or another." Supplemental Brief, p. 2 n. 1. These justifications by Biomet, however, miss the point. To say that Hite's desk still remained in the immediate department post-move is not an articulated reason for why Biomet decided to move her work area and put her in a reduced space. Similarly, to say that Hite received training to do the more time consuming credits does not explain why, after having advanced, via seniority, to a different level of work prior to

**8.** Biomet contends that this testimony is evidence that since Walters made rude comments prior to Hite's FMLA leave there can be no causal connection between his post-FMLA conduct toward Hite and her FMLA leave. However, for summary judgment purposes, Hite is entitled to have all reasonable

inferences from this testimony drawn in her favor. Thus, while one reasonable inference is that Walters made rude comments to Hite because he did not approve of her pregnancy, another reasonable inference is the one drawn by this court in denying summary judgment on this claim.

FMLA leave, she was required to do more difficult work after her FMLA leave. Accordingly, Biomet has not met its burden to proffer a legitimate, non-discriminatory reason for its actions. Thus, Biomet's motion for summary judgment as to this claim is DENIED.

### B. *FMLA Retaliatory Discharge Claim*

In her retaliatory discharge claim, Hite raises the issue of whether Biomet discriminated against her by terminating her for having exercised an FMLA right. As noted *supra*, the question of intent is relevant to this type of FMLA claim and thus, the *McDonnell Douglas* burden-shifting approach is permissible for plaintiff to draw the necessary inference of Biomet's intent. Thus, again Hite must demonstrate that "(1) she availed herself of a protected right under the FMLA; (2) she was adversely affected by an employment decision; and (3) there is a causal connection between the two actions." *King*, 166 F.3d 887 (7th Cir.1999). Biomet concedes the first two elements of the prima facie case. However, Biomet argues that no causal connection exists between Hite's FMLA leave and her subsequent termination. This court agrees.

■ It is undisputed that Hite took medical leave from March, 1996 until Biomet terminated her in August, 1996. During this leave time, she returned to work for a single day in April, 1996. In her brief, Hite states that she was fired 10 weeks after she completed the FMLA portion of her disability leave. This indicates that she utilized her FMLA portion of leave early in her protracted leave period. As noted, a plaintiff may establish the existence of a causal link through evidence that the discharge took place on the heels of protected activity. *Dey v. Colt Constr. & Dev. Co.*, 28 F.3d 1446, 1458 (7th Cir. 1994). "One day might do it, *see Johnson v. Sullivan*, 945 F.2d 976, 980 (7th Cir. 1991); so too might one week. *Holland*, 883 F.2d at 1314–15." Here, however, a

little over two months passed and an intervening event occurred, i.e. Hite's failure to report to work, before she was terminated. This is not the type of "telling" temporal sequence which permits Hite to establish a causal connection between her FMLA leave and her termination. *See Hughes v. Derwinski*, 967 F.2d 1168, 1174 (7th Cir. 1992) (four month gap between plaintiff's filing and disciplinary action does not sufficiently raise the inference that plaintiff's filing was the reason for the adverse action). Accordingly, the court GRANTS Biomet's motion for summary judgment.

■ Even had this court determined a causal connection existed, summary judgment would still be warranted because Hite fails to demonstrate that the proffered reason is pretextual. Biomet rebuts Hite's prima facie case with its legitimate non-discriminatory reason, i.e. that it fired Hite for violation of the no call/no show policy. Hite, however, fails to present any evidence which demonstrates that this given reason is a pretext for unlawful discrimination under the FMLA. Further, under the FMLA, an employee who requests leave or is on leave has no greater rights than an employee who remains at work. *See* 29 C.F.R. § 825.216(a). For this reason, an employee who requests FMLA leave would have no greater protection against his or her employment being terminated for reasons not related to his or her FMLA request than he or she did before submitting the request. Biomet sets forth uncontested evidence of: (1) the existence of the no call/no show policy; (2) the uniform enforcement of that policy; (3) Hite's failure to report to work on August 5 or at any time thereafter; (4) Hite's failure to attend her appointment with Dr. Strycker on August 5, 1996; and (5) Biomet's contacts with Dr. Strycker's office on August 6 and August 9. Given the failure of Hite to present any evidence which raises a genuine issue of material fact with regard to pretext, Biomet's motion for summary judgment on the FMLA claims

is warranted on these alternative grounds as well.

In sum, the court concludes that Hite fails to demonstrate a prima facie case of retaliatory discharge under the FMLA and, in the alternative; fails to present sufficient evidence of pretext to withstand summary judgment on her FMLA retaliatory discharge claim. Thus, summary judgment on her retaliatory discharge claim is hereby GRANTED.

### CONCLUSION

Based on the foregoing, Biomet's Motion for Summary Judgment is hereby DE-NIED in relation to Hite's FMLA claim arising out of her first FMLA leave and GRANTED with respect to all other claims.